**UNITED STATES of America,**
**Appellee,**

v.

**Jerome J. HASKELL, Appellant.**

**No. 75, Docket 28027.**

United States Court of Appeals
Second Circuit.

Argued Nov. 1, 1963.

Decided Jan. 27, 1964.

Irving I. Erdheim, New York City (Jacob W. Friedman, New York City, of counsel), for appellant.

Robert C. Zampano, U. S. Atty., District of Connecticut, New Haven, Conn., for appellee.

Before SWAN, CLARK [1] and MARSHALL, Circuit Judges.

MARSHALL, Circuit Judge.

The questions presented on this appeal are the sufficiency of the evidence to sustain appellant's conviction of a violation of the general conspiracy statute, 18 U.S.C. § 371;[2] and alleged errors in the rulings on evidence at the trial and in the charge to the jury.

The one-count indictment charged appellant Haskell, a former key employee of Esquire Motors, Inc.,[3] an automobile dealership in Bridgeport, Connecticut, and Vincent Anthony, president of Esquire with conspiring with each other and unknown persons during the period June 1, 1954 to June 1, 1957 to wilfully attempt to evade and defeat a large part of the income taxes owing to the United States Government by Esquire, Anthony and Haskell, for the fiscal years ending September 30, 1955 and September 30, 1956. The means alleged were that the defendants would make continuing efforts to avoid detection and prosecution of tax frauds, that they perpetrated a scheme to take fraudulent deductions on Esquire's returns of $21,000 in 1955 and $25,000 in 1956, that checks were entered on the corporate records payable to Haskell for purported travel and entertainment expenses and bonuses, and that these checks were not cashed. The overt acts alleged were the issuance of checks to Haskell of $21,000 (dated September 30, 1955) and of $19,000 (dated

1. Judge CLARK died after voting for affirmance, but before expressing his views with respect to this opinion.

2. Defendant made motions for judgment of acquittal both at the close of the government's case and at the close of all the evidence, which were denied. Consequently, the question before us is the sufficiency of the evidence, as a whole, to sustain the verdict, rather than whether a prima facie case was made out by the government. Small v. United States, 255 F.2d 604 (1 Cir. 1958); McDonough v. United States, 248 F.2d 725 (8 Cir. 1957); T'Kach v. United States, 242 F. 2d 937 (5 Cir. 1957); United States v. Aman, 210 F.2d 344 (7 Cir. 1954).

3. Hereinafter referred to as "Esquire."

September 29, 1956), which were not cashed. Anthony was convicted on his plea of *nolo contendere,* entered shortly before trial, and the trial proceeded with Haskell as the only defendant.

Three principal witnesses testified for the government. They were Ralph Piccolo, Jr., Esquire's accountant who prepared its returns during the relevant years; Stephen J. Catandella, Esquire's bookkeeper and Anthony's son-in-law, and Anthony himself. Although there were some variations in their testimony, particularly with regard to dates, they agreed on most essential points. Taking the evidence in the light most favorable to the government, the jury might find the following facts from their testimony.

Haskell joined Esquire in late 1954, under an oral agreement with Anthony that he would receive fifty per cent of the profits less his salary, which was originally fixed at $250 per week and later increased to $300. He immediately took charge of the business, did virtually all of the buying of cars from other dealers and a large part of the selling. Thanks largely to his efforts, Esquire's gross sales jumped from about $2,000,000 in fiscal 1954 to over $10,000,000 in fiscal 1955. Shortly before the close of fiscal 1955, Piccolo prepared a tentative profit and loss statement showing a certain amount of income tax due. He showed this to Haskell, Anthony and Catandella. After looking it over, Haskell threw the statement down, told Piccolo that he was an idiot, that there was too much tax and that they weren't going to pay so much tax. A second meeting between the men, together with an accountant named Henry Clauson was held after the close of the fiscal year,[4] at which Haskell submitted to Piccolo a revised statement that showed additional expenses of $40,800 in the travel and entertainment category. Piccolo protested that "you can't just take travel and entertainment expenses without some substantiation," but ultimately agreed to fill out a return us-

ing the revised figures. When Anthony asked whether this might cause trouble with the income tax people, Haskell answered "well, the worst could happen, Uncle Sam would ask you for the refund and you would have to pay a penalty plus interest on it." On the night of the meeting, Catandella made out three checks, predated to September 30, 1955, one to Haskell for $21,000; one to Anthony for $16,000, and one to himself for $3,800. Haskell designated these amounts. The checks to Anthony and Catandella cleared the bank, but not the one to Haskell, which apparently disappeared. With regard to the 1956 return, the government's evidence was less conclusive. According to Catandella, about two or three weeks after the close of the fiscal year some unidentified person told him to make out the check to Haskell, he drew it, placed it on Haskell's desk, in his presence, and did not see it again. Piccolo testified that, after the income tax return was filed, he noticed while preparing a bank reconciliation that the check had not cleared. He suggested to Anthony and Haskell that an amended return be filed, restoring the amount to income. Haskell never responded but Anthony may have said that the check had not been cashed because there was "no money in the bank." Catandella also testified that Haskell frequently told him to draw checks, but that Anthony had to sign them all.

The foregoing recital establishes that a jury might find that a conspiracy to evade Esquire's taxes existed among Haskell, Anthony, Piccolo and Catandella, with respect to the 1955 return. Haskell not only participated in the conspiracy but indeed actually directed it. All the participants were aware that the claimed deductions for travel and entertainment were not substantiated, and that it was wrong to take them without proof. The evidence regarding the preparation of the 1956 return is weaker but we need not consider whether, standing

---

4. Piccolo initially fixed the date of the meeting as December 1955, Catandella thought it was in October, Anthony testified that it was in September, which would place it before the end of the year.

alone, it would have warranted submission to the jury. A single conspiracy was charged, and it was more than adequately proved. Cf. United States v. Postma, 242 F.2d 488, 496 (2 Cir. 1957); Neely v. United States, 145 F.2d 828 (5 Cir. 1945); Moss v. United States, 132 F.2d 875 (6 Cir. 1943).

The most important of the trial errors assigned as grounds for reversal of the judgment concerns a series of questions which defendant was asked on cross-examination. The matter was broached for the first time on Haskell's direct examination, when his counsel asked whether he was ever convicted of petit larceny, and elicited the answer that he was convicted in 1934 or 1935, and also that he was convicted of speeding. On the next day, the prosecutor first got Haskell to repeat his admission of a petit larceny conviction and then asked, "weren't you convicted of grand larceny and not petit larceny," to which Haskell replied in the negative. The prosecutor then showed Haskell Government Exhibit K for identification, and FBI "rap sheet" which showed that Haskell was arrested on August 26, 1942 for grand larceny in New York, and was sentenced to one year (suspended) "on CL of GL and PL.," and asked him again whether he was convicted of grand larceny. Again a negative answer was received. The government offered the paper in evidence; defense counsel objected and was sustained. Before trial resumed on the afternoon of that day, the prosecutor informed the judge that the FBI sheet, on which he relied for his questions with regard to a grand larceny conviction, was erroneous. In fact, Haskell in 1942 had been charged with grand larceny but pleaded guilty to petit larceny. The court instructed the jury to completely disregard any reference to a grand larceny conviction, because Haskell was never in fact convicted of that crime. He further stated that the reference to the traffic conviction should not be construed as having any bearing on the witness' credibility. Finally, he told the jury that the government had been in-structed to provide proof of any criminal record in the form of certified copies of any judgments of conviction and that their minds should be kept completely open until the proof arrived. The judge later charged that the sole item in Haskell's record was a petit larceny conviction in 1942, to which counsel had stipulated.

■■ As a general rule, of course, it is grossly improper for a cross-examiner to suggest that a witness has been convicted of crimes, especially felonies, when he has no support for the question. 3 Wigmore, Evidence § 780 (Supp. 1962). Here, however, it appears that the prosecutor's examination was based on an honest reliance on the FBI report, that he informed defense counsel prior to trial of his intention to bring up the grand larceny matter, and that he promptly moved to correct the erroneous impression which the jury might have acquired despite Haskell's denial that such a conviction was on his record. The judge was equally vigorous in protecting the defendant's rights. Furthermore, no objection was lodged to the two specific questions dealing with the grand larceny conviction. In the light of all these circumstances, asking the questions on this point were not reversible error.

■■ Two other points relating to examination are raised. On cross-examination of Anthony, whom the defense recalled after he testified for the Government, the prosecutor asked, "Did you give any money to Mr. Haskell over and above the salary that was paid out of Esquire Motors?" Counsel objected to the question, and moved for a mistrial after an affirmative answer was given, on the ground that it tended to show Haskell was guilty of another crime, i. e., failure to report income on his personal return. This point is not well taken. On Haskell's individual tax return, which was in evidence, he showed salary of $24,800, and $21,000 as an advance for traveling expenses, together with $20,782.05 claimed expenses. It was proper cross-examination to determine whether the moneys reported as advanced had ever

been paid from other funds than the $21,000 check which never cleared. Another asserted error concerns a ruling sustaining a prosecution objection to a question which defense counsel asked of Max Hecht, a certified public accountant called as an expert witness for the defense. The question was "Now, in your opinion, and based upon your experience, sir, was it wrong for Mr. Haskell to claim a deduction for travelling expenses for the years 1955 and 1956?" Defense counsel then stated that he was merely attempting to show that travel and entertainment expenses were a proper category of deduction. He then asked the question "Is a deduction for travel and entertainment a proper deduction, if used in connection with one's business," and received an affirmative reply. Since this answer established what defendant sought to show, no grounds for objection exist.

We next turn to the court's charge, which was a long and comprehensive one that occupies over one hundred pages in the transcript and took over four hours to deliver. Before he went into the specific elements of the offense and a review of the evidence, the judge made some preliminary observations concerning the interests at stake in the trial. Specifically, he said:

"Now, preliminarily, before taking up the statute which is the basic point to begin with in this case, let me just say preliminarily that I believe all of us, counsel on both sides, you ladies and gentlemen, and the Judge, are in accord that this is an important case. An important case to both sides.

"What are the critical, competing interests involved? On the one hand, the Government is concerned, and rightfully so, that the revenue laws of the United States be enforced, that they not be violated. There is, in the language of the Supreme Court of the United States, no more serious crime than the crime of defeating or evading taxes or a conspiracy to do so.

"The reason for rigorous, strict enforcement of the Internal Revenue laws is perfectly obvious to all of us. All we have to do is recount the events of the last few weeks, even during the period that this case has been on trial. We all recognize, the defendant, the Government, their counsel, all of us, that but for the impartial, vigorous, intelligent enforcement of the revenue laws, of the United States, we would be in a sorry situation. Certainly the liberty of all of us, indeed, the liberty of the free-speaking world, in a very real sense, is keyed to the proper enforcement of our own Internal Revenue laws.

"In short, to strike at or evade income taxes, is to strike at the jugular vein of our American system of government. That's the interest of the Government in this case and it is the interest of all of us."

After these remarks, the judge devoted considerable time and effort to explaining the rights and interests of a defendant in a criminal trial. Later, on objection by counsel he instructed the jury to disregard the statement that the Supreme Court had called tax evasion among the most serious of crimes. Objection to these paragraphs is nonetheless pressed here.

It may well be that some of the comments made by the trial court were unfortunate, and taken in isolation, might have raised improper inferences in the jurors' minds. However, considering their context and purpose, we do not feel that they could have had any significant effect. The judge was merely making some preliminary remarks to set the case in focus, as it were. All elements of the crime charged, burden of proof, and the manner of weighing evidence were later gone into in the most painstaking and thorough way. It is difficult to see how these few words could have inflamed the jury against the defendant.

The next objection concerns the court's instruction on character witnesses. The instruction was as follows:

"There has been some character testimony here. As you will recall, several of the witnesses called by Mr. Haskell, testified to his character. Good reputation is not a defense to a crime. We all know that it is not an extraordinarily rare thing for men of very good reputation to be found to have committed some crime. And yet, the law recognizes the relation between good reputation in general, and a particular crime. Good reputation is usually based upon good character, to a greater or lesser extent, and the law says that if a man has a good character, it is perhaps less likely that he has committed a particular crime which is charged against him. It does not mean that if a man actually has a good reputation, that he does not commit the crime. His good reputation in the community is, if you find it proven, a circumstance that you are to weigh with the other circumstances in the case in arriving at your final conclusion.

"On a doubtful question, good reputation alone might be of sufficient weight to raise a reasonable doubt as to the guilt of the accused."

Defendant objected to the failure to charge in the exact language he requested, which was "that evidence of defendant's good character is in the same category as other factual evidence and must be considered by you in your deliberations, and may of itself, if believed by you, create a reasonable doubt when otherwise no reasonable doubt would exist." We feel that the charge, as a whole, fairly set forth the position of character evidence, and permitted the jury to consider good reputation along with all the other evidence in the case. The jury was not instructed as in Edgington v. United States, 164 U.S. 361, 17 S.Ct. 72, 41 L.Ed. 467 (1896), to consider character testimony only if the other evidence was equally balanced. Even if the one phrase, "on a doubtful question," be deemed too restrictive a view of the function of character evidence, see Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948); United States v. Minieri, 303 F.2d 550 (2 Cir. 1962), any error resulting from its inclusion was in the circumstances of this trial quite insubstantial. Cf. United States v. Kushner, 135 F.2d 668, 674 (2 Cir. 1943).

Finally, appellant complains of the following language toward the conclusion of the charge:

"You, therefore, will take this case with you to the jury room, determine the facts on the basis of the evidence as it has been presented to you, apply the law as I have attempted to outline it to you, then render a verdict fairly, uprightly, and without a scintilla of prejudice, which I am sure is unnecessary to say to you, ladies and gentlemen, either against the defendant or against the Government."

He asserts that this amounted to an instruction that the verdict be either against the defendant or against the Government. As a matter of interpretation of language, this is erroneous. The phrase "against the defendant or against the Government" clearly related to "without a scintilla of prejudice" rather than to "render a verdict." The court repeated its charge in slightly different form after counsel objected, and added "Your verdict must be in the form of either not guilty as charged, or guilty as charged." No possibility of misunderstanding existed.

The trial lasted eight days, and was marked by both vigorous advocacy on each side and scrupulous fairness of the judge. Ample evidence to support the verdict exists, and no prejudicial errors have been shown. Therefore, the judgment is affirmed.