**UNITED STATES of America,
Appellee,**

v.

**Vincent PACELLI, Jr., Defendant-
Appellant.**

**No. 368, Docket 73–2137.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 1, 1973.

Decided Jan. 11, 1974.

Steven B. Duke, New Haven, Conn., for defendant-appellant.

Paul J. Curran, U. S. Atty., S. D. N. Y. (Arthur J. Viviani, Walter J. Higgins, Jr., Peter L. Truebner, John D. Gordan III, Asst. U. S. Attys., New York City, of counsel), for appellee.

Before MOORE, HAYS and MANS-FIELD, Circuit Judges.

MANSFIELD, Circuit Judge:

Vincent Pacelli, Jr. appeals from a judgment of conviction in the Southern District of New York, following a jury trial before Judge Charles H. Tenney on both counts of an indictment charging that Pacelli (1) had violated 18 U.S.C. § 241 [1] (1972) by conspiring with Barry

---

1. "§ 241. *Conspiracy against rights of citizens*

"If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

"If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his

Lipsky and others unknown to deprive Patsy Parks of her right to be a witness at trial, causing her death, and (2) had violated 18 U.S.C. § 1503[2] (1972) by using force to impede and injure Parks who had been a grand jury witness and who had been subpoenaed to be a witness for the government in a narcotics case, 71 Cr. 614, then pending against Pacelli.

Pacelli was sentenced to life imprisonment for the § 241 offense and to a concurrent five-year term for the § 1503 offense. Because the trial judge failed to exclude certain hearsay declarations offered to prove the belief of the declarants that Pacelli was guilty, and because the government failed to disclose to defense counsel certain statements made by its principal witness, Barry Lipsky, for use in cross-examining Lipsky, we reverse and remand for a new trial.

This case arises out of the brutal stabbing to death on February 4, 1972, of Patsy Parks whose body—which had been burned with gasoline flames—was found a few hours later by a police officer in a desolate area of Massapequa, Long Island. On the previous evening federal narcotics agents had attempted to serve a subpoena on Parks ordering her to appear as a witness at the trial of the indictment against Pacelli, which Judge Milton Pollack had scheduled to

begin on February 8, 1972. Approximately nine months earlier, on May 27, 1971, Parks had testified before a federal grand jury in the Southern District of New York about a box which a friend told her contained money and which was delivered to Vincent Pacelli, Jr. Later the grand jury returned an indictment, 71 Cr. 614, against Pacelli and three others for violations of the federal narcotics laws.

On the evening of February 3, 1972, the federal agents seeking to serve the subpoena on Parks went to her Manhattan apartment, where they found her roommate, Patricia Quinn, who was told by them that they were looking for Parks in order to serve her with a subpoena. Upon learning shortly thereafter from Quinn of the attempted service, Parks went to a Manhattan discotheque, the Hippopotamus, where she approached Barry Lipsky, a friend of Pacelli, and told him she urgently wanted to see Pacelli about the subpoena.

Lipsky testified that he had been working for Pacelli since April 1971. After telling Parks to wait at the Hippopotamus he took a taxi to Pacelli's apartment at 501 Pelham Road, New Rochelle, New York where he found Pacelli, his wife Beverly, Barbara Jalaba (Beverly's sister) and Al and Ida Bracer, who were close friends of Pacelli's.

free exercise or enjoyment of any right or privilege so secured—

"They shall be fined not more than $10,000 or imprisoned not more than ten years, or both; and if death results, they shall be subject to imprisonment for any term of years or for life."

2. "§ 1503. *Influencing or injuring officer, juror or witness generally*

"Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States or before any United States magistrate or other committing magistrate, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate or other committing magistrate, in the discharge of his duty, or injures any party or wit-

ness in his person or property on account of his attending or having attended such court or examination before such officer, commissioner, or other committing magistrate, or on account of his testifying or having testified to any matter pending therein, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, magistrate, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both."

According to Lipsky, when he told Pacelli in the presence of the others that a girl named Patsy wanted to see him about a subpoena, Pacelli said: "That goddam box . . . I know it's about that goddam box. . . ." Lipsky quoted Pacelli as saying just before leaving with Lipsky to return to Manhattan, "I know what I have to do."

Lipsky testified that the following events then occurred. Pacelli and Lipsky drove Mrs. Pacelli's rented car back to Manhattan. On the way they stopped at a gasoline station where Lipsky purchased four one-gallon cans of gasoline which Pacelli said he needed "to burn up the girl's body." Arriving at the Hippopotamus at approximately 2:00 A.M., they picked up Parks and proceeded to head—with Pacelli driving—toward Massapequa, Long Island. During this drive Pacelli offered Parks money to go to "California or to Brazil" which Parks rejected since she said she had to stay in New York for her job and for her child.[3] When the car, after about an hour, reached Massapequa Lipsky took the wheel at the request of Pacelli, who shifted to the back seat. Almost immediately thereafter Pacelli stabbed Parks in the throat. Parks pleaded with Pacelli not to hurt her since she was a mother, but he said, "Die, you bitch," and stabbed her several more times in the throat until she was dead. Thereupon Pacelli told Lipsky to drive to a wooded area where they dumped Parks' body and Lipsky set it afire after Pacelli had poured the gasoline over it.

On the way back to New Rochelle, according to Lipsky's testimony, he and Pacelli stopped at a gas station where Lipsky threw the contents of Parks' pocketbook away after removing the money—$20—and then at a body of water about three blocks from Pacelli's apartment where Lipsky threw into the water the knife which had been used to murder Parks. Lipsky spent the night at Pacelli's apartment and awoke during the morning of the 4th to hear Pacelli's wife and sister-in-law complaining about the work they had to do to clean blood from the rented car. Later that day Pacelli, his wife and sister-in-law, Lipsky and another friend named Abbe Perez returned the rented car to an Econo-Car agency on Westchester Avenue in the Bronx. On the evening of February 5th, Lipsky had dinner with Pacelli at a Manhattan restaurant where Pacelli expressed satisfaction at having killed Parks since she would have testified against him at his upcoming trial for narcotics violations.

Pacelli and his co-defendants went to trial in the narcotics case before Judge Pollack on February 8th, and on February 10th Judge Pollack remanded Pacelli to jail when the prosecutor in the case advised him that Parks had been killed.

Of particular significance in the present case, in view of objections by defense counsel at trial, is Lipsky's testimony regarding statements made by certain friends and relatives of Pacelli at a meeting on February 10th, immediately after Pacelli's remand, which Lipsky attended as the result of a phone call to his home from Beverly Jalaba, Pacelli's wife who told him to meet her at the Manhattan apartment of Pacelli's uncle and aunt, Frank and Antoinette Bassi. Lipsky was permitted to testify over objection that when he arrived at the Bassis' apartment Beverly took him aside and told him that Parks' body had been found and Pacelli had been put in jail. Also present at the apartment were Beverly's sister Barbara Jalaba, the Bassis, Pacelli's sister Loretta, Al Bracer, Abbe Perez, and a man named Bayron. Lipsky testified that "Frank Bassi was saying that there is a million places to put a body and you don't have to . . . burn it up and leave it laying right out in the middle of nowhere for people to find." Lipsky testified further that Abbe Perez and Al Bracer took Lipsky aside and told him to go away for a

---

3. At the time of her death, Parks was separated from her husband. The couple had had one child.

while. Later, that night, in the presence of Pacelli's wife, Perez gave Lipsky $1,000 for the trip.

The next day, February 11th, Lipsky went to Miami Beach, Florida. On February 16th, Al Bracer again rented the same car which Pacelli's group had returned to Econo-Car on February 4th. Two days later the car was found in flames in New Jersey but a chemical analysis was able to determine that traces of blood were present on the rug located on the right front passenger side of the car. On March 2, 1972, Lipsky was arrested by Nassau County authorities when he returned from Florida. He confessed that he had been present during the murder of Parks but insisted that Pacelli had actually carried out the murder. After his confession Lipsky was indicted for murder by the State of New York. On March 7, 1972, Pacelli's New Rochelle apartment was searched pursuant to a warrant and among the items seized were several coats similar to the one which Lipsky claimed Pacelli wore on the night of the murder. One of these coats had traces of blood on it. On March 13, 1972, a knife was recovered from the water at the Cameron Boat Rental Company of New Rochelle, which was two blocks from Pacelli's apartment.

Shortly after his arrest by Nassau County authorities, Lipsky began talking with federal narcotics agents about Pacelli's narcotics operations. As a result three new indictments were returned against Pacelli: 72 Cr. 664 on June 5, 1972; 72 Cr. 1319 on December 4, 1972; 73 Cr. 441 on April 16, 1973. In June 1972 Pacelli was convicted on 72 Cr. 664 solely on Lipsky's testimony and in December 1972 Pacelli was tried on 72 Cr. 1319. During cross-examination of Lipsky, defense counsel produced tape recordings of conversations between Lipsky, his attorney, and members of the United States Attorney's staff, which occurred in March and April 1972, during which Lipsky was promised immunity on any and all matters concerning which he would provide evidence to the federal authorities. Since Lipsky had perjuriously denied in his testimony in the trial of both narcotics charges (72 Cr. 664, 72 Cr. 1319) that he had received any consideration for his testimony, the conviction in 72 Cr. 664 was vacated and a mistrial was declared in 72 Cr. 1319. A few days later, on December 22, 1972, Lipsky wrote a four-page letter to Robert Morvillo, who was then Chief of the Criminal Division in the United States Attorney's office for the Southern District of New York. In it he stated among other things that he was in a "terrible mental state" because of the mistrial he had caused, and declared that his "main purpose for the last 9½ months" was to *"try my very best* to assist the Government," and that he *"looked forward eagerly to testifying* in narcotics cases *for* the Government, *against* Vincent Pacelli Jr. and others." (Emphasis in original)

On January 15, 1973, Lipsky entered a plea of guilty to a reduced charge of manslaughter in Nassau County. When the plea was entered a letter from the United States Attorney's office for the Southern District of New York setting forth Lipsky's cooperation in federal narcotics investigations and his anticipated testimony against Pacelli in the present case was read to the judge who accepted the plea. Two weeks later, on January 31, 1973, the indictment leading to this appeal was returned against Pacelli. Trial of the indictment charging Pacelli with violating 18 U.S.C. § 241 (1972) (Count I) and 18 U.S.C. § 1503 (1972) (Count II) commenced on April 30, 1973, and on June 1, 1973, after the jury had on May 3, 1973, found Pacelli guilty as charged, Judge Tenney sentenced Pacelli to a term of life imprisonment on Count I and a term of five years to be served concurrently on Count II.

### Discussion

On this appeal Pacelli argues that 18 U.S.C. § 241 does not protect any federal right to be a witness at a trial and that if it does his conviction must be re-

versed since the trial court permitted the introduction of prejudicial hearsay when it allowed Lipsky to testify as to what Beverly Pacelli, Frank Bassi and others said to him at the Bassis' apartment on February 10, 1973. Furthermore, Pacelli claims he was denied the right to fully cross-examine Lipsky since the government did not disclose statements made by Lipsky to the federal narcotics agents and his letter to the United States Attorney and since the trial court would not permit defense counsel to fully explore the circumstances of Lipsky's confession to the Nassau County authorities or Lipsky's relationship and dealings with the United States Attorney's office. Pacelli also raises several other objections to the sufficiency of proof under § 241 and to the conduct of the trial court and of the government's prosecutor.

*Scope of Section 241*

■ Title 18 U.S.C. § 241 protects the free exercise of rights "secured by the Constitution or laws of the United States." In deciding whether a right is so secured, it is not enough simply to scan the Constitution or laws to see whether the right is mentioned specifically. The Supreme Court has long made clear that certain rights are implicitly conferred by the Constitution's establishment of a national government intended to be "paramount and supreme within its sphere of action." In re Quarles, 158 U.S. 532, 15 S.Ct. 959, 39 L.Ed. 1080 (1895); Logan v. United States, 144 U.S. 263, 12 S.Ct. 617, 36 L. Ed. 429 (1892). One of these is the right to testify at a federal trial in response to a request or command of a federal district court. Our federal government has a particular interest in assuring a prospective witness that he or she will be free to respond by attending the trial of a federal indictment as a witness without being prevented from doing so by threats, molestation or force. Otherwise the foundations of federal justice would be undermined. In *Quarles* the Court, in holding that a citi-

zen's right to inform federal authorities concerning violations of the internal revenue laws is secured by the Constitution even though it is not specifically mentioned in "any of the Amendments," stated that "[t]o leave to the several states the prosecution and punishment of conspiracies to oppress citizens of the United States, in performing the duty and exercising the right of assisting to uphold and enforce the laws of the United States, would tend to defeat the independence and the supremacy of the national government." 158 U.S. 536–537, 15 S.Ct. 961. See also Motes v. United States, 178 U.S. 458, 20 S.Ct. 993, 44 L. Ed. 1150 (1900); Foss v. United States, 266 F. 881 (9th Cir. 1920) (right to testify as a witness is secured by Constitution or laws of the United States). This principle applies with equal force in the present case.

Appellant urges that even if the Constitution does secure to citizens a right to testify at federal criminal trials, Congress in 1968 responded to confusion over the scope of § 241 by listing the Constitutional and statutory rights protected by the section. Congress did this, appellant contends, not by amending § 241 in any significant respect but by enacting an entirely new section, 18 U.S.C. § 245, which made it unlawful to interfere with a number of specifically listed "federally protected activities" including: voting, using government facilities, applying for employment with government agencies, serving as a petit or grand juror, and receiving federal financial assistance. Appellant says that Congress chose the extraordinary course of amendment by implication rather than outright repeal of § 241.

■■ It is well settled that repeals (or amendments) by implication are not favored and will be given effect only upon a clear showing of Congressional intent, such as where the two statutes at issue are in irrevocable conflict or the later act unquestionably covers the entire subject of the earlier one and is obviously designed as a substitute for it. See Posadas v. National City Bank, 296

U.S. 497, 503, 56 S.Ct. 349, 80 L.Ed. 351 (1936). No such showing is made here. This is not a case like that cited to us by appellant, United States v. Lovely, 319 F.2d 673 (4th Cir.), cert. denied, 375 U.S. 913, 84 S.Ct. 210, 11 L.Ed.2d 151 (1963), where both laws covered identical subject matter: South Carolina's consent to the acquisition of its land by the United States for any public purpose and the procedures to be followed for the vesting of jurisdiction over the lands acquired in the United States. Here, in contrast, it is far from clear that § 245 covers the identical subject matter as § 241. Furthermore appellant concedes that § 241 outlaws *conspiracies* to violate the free exercise of Constitutional rights and privileges whereas § 245 is limited to specifically enumerated *substantive offenses*, including those committed by a single person. Compare Chase v. United States, 256 U.S. 1, 41 S.Ct. 417, 65 L.Ed. 801 (1921) with Gibson v. United States, 194 U.S. 182, 24 S.Ct. 613, 48 L.Ed. 926 (1964).

In support of his amendment by implication theory, appellant relies upon Senate Report 721 issued by the Senate Committee on the Judiciary to accompany H.R. 2516, the bill which was ultimately turned into § 245. See U.S.Code Cong. and Admin. News, 90th Cong., 2d Sess., pp. 1837, 1838 (1968). Specifically we are directed to that portion of the Report which, after referring to Justice Brennan's suggestion in United States v. Guest, 383 U.S. 745, 786, 86 S.Ct. 1170, 1193, 16 L.Ed.2d 239 (1966), that Congress might render § 241 more effective by defining the rights encompassed by it with greater specificity, states:

> "H.R. 2516 meets this need by spelling out the kinds of activity to be protected, and the bill provides an effective means of deterring and punishing forcible interference with the exercise of Federal rights. The clear language of the bill would avoid unnecessary litigation concerning coverage and would provide unmistakable warning to lawless elements not to interfere with any of these activities."

However, if Congress had intended to restrict itself merely to defining and limiting the rights described in general terms in § 241, it knew how to accomplish that objective. It would have simply enumerated the detailed rights in § 241 itself, with appropriate restrictive language. Instead it chose to enact a separate law after receiving testimony to the effect that the proposed new statute " . . . parallels but does not supplant those existing federal criminal statutes [18 U.S.C. 241 and 242], and undertakes to cure some of their deficiencies." Hearings on S. 1026, etc., before the Subcommittee on Constitutional Rights of the U.S. Senate Committee on the Judiciary, 90th Cong., 1st Sess. at 312 (1967). Nor was the failure expressly to limit or repeal § 241 an oversight. Congress simultaneously amended that statute expressly to provide an increased penalty when death or bodily injury resulted from activities prohibited by the statute. It was well aware of the differing scopes of the two respective statutes.

The Congressional purpose in enacting § 245 was not to repeal § 241 but to remove any doubt as to the protection that would be extended against private interference with certain specific rights enumerated in § 245. Neither the language nor the legislative history of the new statute indicates the slightest intention to strip the national government of its existing ability under § 241 to protect such important interests as the right to remain in the official custody of a United States Marshal, Logan v. United States, 144 U.S. 263, 12 S.Ct. 617, 36 L. Ed. 429 (1892), to inform on violations of federal law, In re Quarles, 158 U.S. 532, 15 S.Ct. 959, 39 L.Ed. 1080 (1895), to testify at proceedings held under authority of federal law, Foss v. United States, 266 F. 881 (9th Cir. 1920), to travel interstate to arrive at the seat of government, United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1965), to assemble and petition the Congress for a redress of grievances, United States v. Cruikshank, 92 U.S.

542, 552, 23 L.Ed. 588 (1875). This would have been drastic action entirely unnecessary and unrelated to the principal purpose of the Committee, which was to draft a law effectively dealing with racial violence only.[4]

In short, we find no basis in the new statute or in its history warranting a departure from the rule against amendments by implication. Indeed it would have been an extraordinary step for Congress to repeal a 100-year old generic statute which "from original enactment through subsequent codifications was intended to deal . . . with conspiracies to interfere with 'Federal rights, and with all Federal rights.'" See United States v. Price, 383 U.S. 787, 801–805, 86 S.Ct. 1152, 1161, 16 L.Ed.2d 267 (1965).

Pacelli further argues that, even assuming the applicability of § 241, the government failed to prove a violation because Parks did not want to testify. This contention borders on the frivolous. It was her unwillingness to depart from the jurisdiction and Pacelli's own statement that "she was set to testify against him at trial" that provided his motive for his killing her.

### Admission of Hearsay Evidence

Appellant next urges that it was prejudicial error on the part of the trial court to have permitted Lipsky, over defense objections, to testify as to the conduct and statements of appellant's wife, Beverly, of his uncle, Frank Bassi, and of his friends Perez and Bracer on February 10, 1972, at the Bassis' apartment. We agree. Since the conspiracy to violate Parks' civil rights had terminated with her death, this proof was not admissible as declarations of a co-conspirator made in the course of a conspiracy or as evidence of acts designed to show illegal activity on the part of the conspirators themselves. See United States v. Lutwak, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1952); United States v. Costello, 352 F.2d 848 (2d Cir. 1965), vacated on other grounds, 390 U.S. 201, 88 S. Ct. 898, 19 L.Ed.2d 1033 (1968). The purpose of the evidence was to get before the jury the fact that various persons other than Lipsky, who had been closely associated with Pacelli, believed Pacelli to be guilty of having murdered Parks. Indeed the government frankly conceded this in its brief:

"The fact that Pacelli's wife summoned Lipsky to the Bassis' apartment is proof that she knew of his involvement with Pacelli in the murder. The fact that Pacelli's wife, uncle, and close friends were discussing at that meeting that the murder had been bungled by leaving the body where it could easily be found—rather than that Pacelli had been remanded for something he had not done—is strongly indicative that they knew that Pacelli caused Patsy Parks's death. . . . [T]he jury was entitled to conclude,

4. When it first emerged from the Senate Committee on the Judiciary, H.R. 2516 applied only to deprivations of the listed federal rights which were racially motivated. See 113 Cong.Rec. 37117 (1967). It was subsequently amended after much acrimonious debate to prohibit deprivations of some federal rights which were nonracially as well as racially motivated. See 114 Cong.Rec. 4570–71 (1968).

Appellant notes that the majority of the Senate Committee on the Judiciary rejected an alternative to H.R. 2516 proposed by Senator Ervin which would have included four enumerated rights not included in the bill which became law. One of the rights listed in the Ervin bill and not in H.R. 2516 was the right to inform on violations of Federal Criminal Law. However, appellant's position might be persuasive if the majority had accepted rather than rejected the Ervin proposal since the Ervin proposal—unlike the majority's—was clearly concerned with federal rights other than Fourteenth Amendment rights. See S.Rep. 721, U.S.Code Cong. & Admin.News, 90th Cong., 2d Sess. 1968, at pp. 1854–1861 (1968) (minority views of Senator Ervin). The majority's narrow focus on *racially* motivated interferences with voting or equal use of federal and state facilities (or receipt of benefits) indicates persuasively that the majority, in proposing H.R. 2516, did not intend to preempt or restrict the whole field already covered by 18 U.S.C. § 241.

from the close relationship to Pacelli of the persons at the February 10th meeting, that the source of their knowledge was Pacelli himself, since he was the only person besides Lipsky present at the commission of the crime.

"The additional fact that at this meeting Pacelli's wife told Lipsky to get instructions from Bracer, who, with Perez, then told Lipsky he should go to Florida and offered him the money to do so, was clearly evidence that they knew that Lipsky had seen Pacelli kill Parks." [5]

Since the extra-judicial statements clearly implied knowledge and belief on the part of third person declarants not available for cross-examination as to the source of their knowledge regarding the ultimate fact in issue, i. e., whether Pacelli killed Parks, Lipsky's testimony as to them was excludable hearsay evidence. Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949); 2 J. Wigmore, Evidence § 267 (3d ed. 1940).

In the *Krulewitch* case a defendant was prosecuted for inducing a woman—the complaining witness—to cross state lines for the purpose of prostitution. The complaining witness was permitted to testify at trial that several weeks after the crime had been committed defendant's co-conspirator told her not to talk and suggested that they (defendant's co-conspirator and the complaining witness) take the blame rather than defendant since defendant "couldn't stand it." [6] The Supreme Court held that permitting the testimony was reversible error since it introduced an extra-judicial statement which "plainly implied that petitioner

was guilty of the crime for which he was on trial." The Court stated:

"The statement plainly implied that petitioner was guilty of the crime for which he was on trial. It was made in petitioner's absence and the Government made no effort whatever to show that it was made with his authority. The testimony thus stands as an unsworn, out-of-court declaration of petitioner's guilt. This hearsay declaration, attributed to a co-conspirator, was not made pursuant to and in furtherance of objectives of the conspiracy charged in the indictment, because if made, it was after those objectives either had failed or had been achieved." 336 U.S. at 442, 69 S.Ct. at 718.

The admission of testimony as to the third party's declarations in the present case violated the central purpose of the hearsay rule, which is to give litigants "an opportunity to cross-examine the persons on whom the fact finder is asked to rely." Finman, Implied Assertions as Hearsay: Some Criticisms of the Uniform Rules of Evidence, 14 Stan.L.Rev. 682, 684 (1962). We cannot agree that the only source of the extra-judicial declarations and conduct could have been Pacelli himself. Cross-examination of the declarants, had they been produced as witnesses, might have established that the information came from Lipsky himself, from third persons, or from news media, especially since appellant had on the same day been jailed as a result of the discovery of Parks' body.

We consider it irrelevant, under *Krulewitch*, that the extra-judicial statements and conduct admitted in this case may not have been intended by those involved to communicate their belief that Pacelli murdered Parks. The govern-

---

5. Government's Brief, p. 13.

6. The complaining witness' testimony as to her conversation with the co-conspirator went as follows:

"She asked me, she says, 'You didn't talk yet?' And I says, 'No.' And she says, 'Well, don't,' she says, 'until we get you a lawyer.' And then she says, 'Be very careful what you say.' And I can't put it in exact words. But she said, 'It would be better for us two girls to take the blame than Kay (the defendant) because he couldn't stand it, he couldn't stand to take it.'"

ment concedes that if Lipsky had testified that the various declarants (Beverly Jalaba, the Bassis, Perez and Bracer) had told him at the February 10th meeting that Pacelli had admitted to them his participation in the killing of Parks, the testimony would have been inadmissible hearsay. While the danger of insincerity may be reduced where implied rather than express assertions of the third parties are involved, see Falknor, Silence as Hearsay, 48 U.Pa.L.Rev. 192, 194–95 (1940), there is the added danger of misinterpretation of the declarant's belief. Moreover, the declarant's opportunity and capacity for accurate perception or his sources of information remain of crucial importance. See Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv.L. Rev. 177, 215 (1948). Here, for instance, there is no suggestion that the declarants actually observed Pacelli commit the crimes with which he was charged. Thus their extra-judicial implied assertions have even less indicia of reliability than the implied assertion involved in *Krulewitch*, which was held inadmissible. Pacelli was entitled to cross-examine the third party declarants in order to test the validity of the inference—which the government sought to have the jury draw—that he had told the declarants he had killed Parks. See Finman, *supra*, at 689 n. 20.

■ As in *Krulewitch* the government in this case made "no effort whatever" to show that the extra-judicial statements of Pacelli's wife, uncle and "friends" were made with his authority. Generally there must be some evidence of an agency before an alleged agent's declarations can be received as admissions. United States v. Coppola, 479 F. 2d 1153 (10th Cir. 1973); 4 J. Wig-

more, Evidence § 1078 (Chadbourn rev. 1972). Nor is this a case where an agency might be inferred from the surrounding circumstances.[7] See 2 J. Wigmore, Evidence § 280(2) (3d ed. 1940). Two of the four alleged declarants (Perez and Bracer) were not even related to appellant, and it is far from obvious that the statements attributed to appellant's wife were instigated by appellant.

■ Lipsky's testimony regarding the declarations of the third parties in the present case cannot be dismissed as harmless error. Without his testimony the government had no case. It relied upon him as the only eye-witness (other than Pacelli) of the murder of Parks. His credibility was of crucial importance and there were ample grounds for attacking it. He had been convicted of conspiracy to transport stolen securities. He had committed perjury on several different occasions. Indeed a prior conviction of Pacelli on a narcotics charge, which had resulted from Lipsky's testimony, had been set aside and a mistrial declared in still another narcotics charge against Pacelli when it appeared that Lipsky had lied under oath, testifying that he had not received any consideration from the prosecutor when in fact he had been given immunity as to any matter concerning which he provided evidence against Pacelli. Lipsky, furthermore, had been a user of cocaine, with a history of psychiatric disturbances. After having been indicted for the Parks murder by the State of New York in Nassau County, he had on January 15, 1973, been permitted to plead guilty to the reduced charge of manslaughter, at which time the state court judge was furnished with a letter from the United States Attorney for the Southern District of New York attesting to Lipsky's

---

7. DiCarlo v. United States, 6 F.2d 364 (2d Cir.), cert. denied, 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168 (1925), where a witness was permitted to testify that the defendant's wife asked him to secrete certain revolvers, is inapplicable here. In *DiCarlo* there was no hearsay objection to the witness' testimony. The point raised at trial and argued on appeal was that the government had failed to make any showing that the revolvers were connected with the shooting alleged in the indictment. Furthermore in *DiCarlo* the circumstances provided a strong basis for an inference of agency. This does not exist in the present case.

cooperation in federal narcotics investigations and his anticipated testimony against Pacelli in the present case.

Although the government at oral argument pointed to other evidence as corroboratory of Lipsky's testimony, most of this proof was consistent with the defense theory that Lipsky himself had killed Parks and was now attempting to implicate Pacelli as the killer in an effort to obtain leniency for himself. Evidence that the rented car used on the night of the murder was later burned, that traces of blood were discovered in it, and that a knife was recovered from the spot where Lipsky swore that it had been thrown did not, without Lipsky's testimony, tend to establish that Pacelli rather than Lipsky was the killer. Furthermore the traces of blood in the car and on the coat which Lipsky testified as being similar to that worn by Pacelli on the night of the murder were too minute to permit investigators to determine whether they were human blood and, if so, how old.

Against this background the conduct and extra-judicial declarations attributed to the third persons in the Bassis' apartment, which the prosecutor used in summation, assumed a more important corroboratory role than might otherwise have been the case since, in the government's words, they were "strongly indicative that they [the third party declarants] knew that Pacelli caused Patsy Parks's death" and "that they knew that Lipsky had seen Pacelli kill Parks" (Govt's Brief p. 13).

*Failure to Disclose Jencks Act Statements*

Pacelli contends that he was denied a fair trial by reason of the government's failure to furnish him with certain material to which he claims he was entitled under the Jencks Act, 18 U.S.C. § 3500, for cross-examination of Lipsky. Although the government did furnish to Pacelli's counsel two statements made by Lipsky regarding the Parks murder and his grand jury testimony on that subject, it did not turn over (1) his letter of December 22, 1972, to Mr. Morvillo stating that he was in "a terrible mental state," apologizing for his "foul-up" of the earlier narcotic trial against Pacelli because of his having perjured himself, and expressing eagerness to testify for the government against Pacelli, and (2) various statements by Lipsky to law enforcement officers regarding his involvement with Pacelli in the narcotics business. Appellant argues that the failure to do so impaired his cross-examination.

 Under the Jencks Act a defendant in a federal criminal trial is entitled, after a government witness has testified on direct examination, to receive for purposes of cross-examination any "statement" of the witness in the government's possession "which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b) (1970). We have held that the statement must at least "relate generally to the events and activities testified to" before the statement must be produced, United States v. Cardillo, 316 F.2d 606, 615 (2d Cir.), cert. denied, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963), and that the defense is not entitled to statements which are merely "incidental or collateral." United States v. Birnbaum, 337 F.2d 490 (1964). On the other hand, where the government's representations as to relevancy are challenged, the better practice is for it to make the disputed statement available to the trial judge for an *in camera* inspection and ruling, which will normally be upheld in the absence of a showing of abuse of discretion, see, e. g., United States v. Covello, 410 F.2d 536 (2d Cir. 1969), cert. denied, 396 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136, rehearing denied, 397 U.S. 929, 90 S.Ct. 897, 25 L.Ed.2d 110 (1970), rather than risk reversal of a conviction because it played its cards too close to the vest. See United States v. Borelli, 336 F.2d 376, 393 (2d Cir.), cert. denied, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1964).

In this case, after Lipsky had testified on direct examination, appellant's trial

counsel asked to be given whatever reports the government had concerning Lipsky's conversations with federal narcotics agents which led to the three indictments (72 Cr. 664, 72 Cr. 1319, and 73 Cr. 441) of Pacelli for dealing in narcotics. The government refused to furnish these reports on the grounds that the conversations did not relate to the present case against Pacelli for killing Parks. It also unintentionally failed to disclose the existence of Lipsky's letter to Morvillo, its inadvertence being attributed to the fact that with "many prosecutions involving Pacelli" there was a "breakdown in channels of communication" between the different prosecutors handling the different cases. In support of its position the government points to the fact that the Assistant United States Attorney who tried this case also tried a subsequent narcotics case, United States v. Sperling, et al., D.C., 362 F.Supp. 909, in which Pacelli was again a defendant and Lipsky a witness, where the Assistant disclosed the letter as soon as it was shown to him. After a fresh review of Lipsky's narcotics statements the United States Attorney also forthrightly disclosed upon oral argument that the government had discovered "three short paragraphs" in two of the statements which should have been disclosed but, again due to over-sight, had not been produced and turned over to appellant's trial counsel.[8]

■ Accepting the government's assertion that these nondisclosures were inadvertent, we cannot agree with its characterization of them as "harmless error." Although appellant's counsel possessed an abundance of impeaching material which he exploited at trial, none of this information conveyed quite so forcefully as Lipsky's letter to Morvillo the desperate state of Lipsky's mind after he had caused a mistrial by perjuring himself in the previous narcotics prosecution against Pacelli. The letter, furthermore, contains a blatant lie to the effect that his perjury, which caused the mistrial, had been unintentional rather than deliberate.[9] Appellant's counsel would probably have sought to make this letter the "capstone" of his attack on Lipsky's credibility, cf. United States v. Miller, *supra,* and argued that it revealed a frantic—even mentally disturbed—person who was ready to tell any lie to anyone in order to save himself from a murder conviction in the state court.[10] Denial of the opportunity to use such forceful impeaching material bearing on the credibility of the government's key witness mandates a new trial.[11]

■ Our comments with respect to the government's failure to disclose Lip-

---

8. Upon oral argument the government stated that the Assistant U.S. Attorney who tried the case had reviewed the statement *before trial* but "simply overlooked the three paragraphs . . . and never again in getting ready for trial and putting the case before the jury had occasion to go back to those statements." However, the record discloses that the narcotics statements were repeatedly "flagged" by defense counsel, United States v. Miller, 411 F.2d 825 (2d Cir. 1969), and that the Assistant specifically represented to the trial court during trial and in response to particular inquiries by defense counsel that he would recheck the narcotics statements.

9. In his letter, Lipsky represented to Morvillo that he committed perjury in the prior case because he was "confused" by defense counsel's questions concerning promises by the prosecutor's office. Later, in the *Sper-*ling trial, under cross-examination based on the Morvillo letter, Lipsky admitted that his prior perjury was not caused by any confusion.

10. The letter was dated December 22, 1972. The murder charge was not reduced to manslaughter until January 15, 1973.

11. Since argument of the appeal the United States Attorney has, with characteristic forthrightness, turned over another letter written by Lipsky, this time on December 6, 1972, to Assistant United States Attorney Gerald A. Feffer, which recently came to light in the trial of another case. Since it contains additional material that could have been useful to the defense in cross-examination of Lipsky, it serves to reinforce the conclusion already reached by us with respect to Lipsky's December 22, 1972, letter to Mr. Morvillo.

sky's letter do not apply to its refusal to furnish his narcotics statements. From our examination of the samples of these statements which were handed up to this court upon oral argument we are satisfied that if these samples are representative, the contents did not relate to the subject matter of Lipsky's direct examination except for the three excerpts which the government concedes that it inadvertently failed to disclose.[12] The mere fact that Lipsky had referred generally in his direct testimony to his employment by Pacelli in the narcotics business did not entitle his counsel to explore his earlier detailed statements on that matter, which was strictly collateral to the subject of his testimony, i. e., the circumstances surrounding the Parks murder. See United States v. Cardillo, *supra*.

### Trial Court's Rulings with Respect to Cross-Examination and Prosecutor's Remarks in Summation

Since the case must be remanded we find it advisable to consider the other issues raised by Pacelli's counsel in order to minimize such doubt or possible error as may otherwise be encountered upon a retrial.

 The able and experienced trial judge acted well within his discretion in restricting certain attempted cross-examination of Lipsky. The subjects which defense counsel sought to explore had either been adequately covered (e. g., Lipsky's prior perjury, his testimony that he had been struck by Nassau County police when interrogated, his relationship with Pacelli in the narcotics business) or were of extremely tenuous relevancy (the prosecutor's discussions with Lipsky regarding his prior perjury). These are areas best left to the discretion of the trial judge, who usually is best able to determine the relevancy of proffered examination on the basis of his day-to-day following of the evidence as it unfolds. See Smith v. Illinois, 390 U.S. 129, 132, 88 S.Ct. 748, 19 L.Ed.2d

956 (1968); United States v. Mahler, 363 F.2d 673, 678 (2d Cir. 1966); United States v. Bowe, 360 F.2d 1, 14 (2d Cir. 1966).

Similarly, the cross-examination of Pacelli as to whether he had said that if anybody should ever double-cross him he would "shoot their kneecaps off," while presenting a closer question, may well have been justified as evidence of a generic threat bearing on the issue of intent to prevent Parks from testifying against him, see I Wigmore § 102 (3d ed. 1940); United States v. Anunziato, 293 F.2d 373, 377 (2d Cir.), cert. denied, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961), provided the government had "support for the question," cf. United States v. Haskell, 327 F.2d 281, 284 (2d Cir.), cert. denied, 377 U.S. 945, 84 S.Ct. 1351, 12 L.Ed.2d 307 (1944), which it represents that it did.

The prosecutor's comments on summation were well within the bounds of propriety. Pacelli's contention that he was denied a fair trial by reason of disparaging remarks of the trial judge is not only frivolous but misleading, being based on remarks lifted out of context by his counsel on this appeal, a practice which departs from ethical standards expected of such counsel. Such mild reprimands of trial counsel as were delivered by the trial judge appear from the record, when read in context, to have been fully justified.

The judgment of conviction is reversed and the case is remanded for a new trial.

MOORE, Circuit Judge (dissenting):

I dissent and would affirm the judgment of conviction.

The key witness for the government was Lipsky. As so frequently is the case, particularly when the crime is murder, narcotics dealing or bank robbery, the government's witnesses are not outstanding members of the community noted for their morality and rectitude. The jury is invariably instructed, as it

---

12. Standing alone the failure to disclose the three excerpts would be harmless error.

was here, that, in the light of all the facts brought out on examination and cross-examination, they may accept or reject any or all of the witnesses' testimony. The opportunity to see the witness, hear his testimony and appraise its worth is fundamental to our system of criminal justice.

There were only two persons present at the scene of Parks' murder, Pacelli and Lipsky. Lipsky recited his version of what he saw and heard. Many reasons for disbelief were advanced, amongst which were the facts that Lipsky was a perjurer and Lipsky had been promised immunity and lenient treatment. Such a man might well be disbelieved by a jury, and for good cause. However, this jury believed him.

Of course, error can be found if the jury was influenced by improper testimony but any judge experienced in reviewing jury trials knows that every violation of text book rules of evidence does not and should not constitute reversible error. Although a doctrine of "harmless error" has been evolved by appellate courts, this is but a catchphrase for an ultimate conclusion of fact by the reviewing court. Translated into realistic terms, it means not that the appellate court knows with any degree of certainty what piece or pieces of evidence influenced any particular juror and in what way; but rather, on balance, was the evidence so strong for conviction that the appellate court is willing to substitute itself for the jury and decide that the "harmless error" evidence placed before the jury would not—or better, should not—have changed the result. In my opinion, the decision here should be made upon this theory which, in turn, calls for an analysis of the specific facts allegedly erroneously admitted.

As stated, the murder scene on February 4, 1972, was luridly described and Pacelli's role therein presented by Lipsky. The method of the murder, the blood in the car, the blood on the coat, Pacelli's statement to Lipsky on February 5th of satisfaction at having killed Parks, were all properly before the jury. If the jury believed Lipsky (and it apparently did), nothing more was required.

Turning now to the "hearsay" constituting, according to the majority, reversible error, of what does this hearsay, so damaging as to require reversal, consist? On February 10th at the apartment of Frank Bassi (Pacelli's uncle) were gathered, Bassi, Pacelli's wife, Beverly, Beverly's sister, Barbara, Pacelli's sister, Loretta, three friends, Al Bracer, Abby Perez and Barbara Jalaba, and a man named Bayron. By this time via the public press, Parks' murder and the burning of the body had been revealed to the public at large. Frank Bassi commented about the bungling technique used in trying to dispose of the body. Lipsky was induced to go away for a while and given $1,000 by Perez for that purpose. From this the majority conclude that these "extra-judicial statements clearly implied knowledge and belief on the part of third person declarants not available for cross-examination as to the source of their knowledge regarding the ultimate fact in issue, i. e., whether Pacelli killed Parks." However, there was no declaration that Pacelli had told them that he had killed Parks and none expressed an opinion to this effect so that any such "hearsay" problem is not before us. Thus, Lipsky's statements of the February 10th apartment conversation added so little—and this only by way of inference—to his actual eye-witness testimony as to the events on February 4th that it does not, in my opinion, fall within the category of reversible error.

Turning to the alleged Jencks Act violation, there is no doubt that the Lipsky-Morvillo letter revealed that Lipsky wished to go to extremes to obtain favorable prosecution and court consideration. However, this field had been adequately covered on cross-examination and the jury was well aware of the circumstances under which the testimony was given. Thus this letter did not con-

tain the crucial ammunition for cross-examination that the appellant would have us believe.

With the majority's conclusion and discussion of Section 241 I am in accord.

For the above reasons, I would affirm.