UNITED STATES of America,
Appellee,

v.

Vincent PACELLI, Jr.,
Defendant-Appellant.

No. 1153, Docket 75–1149.

United States Court of Appeals,
Second Circuit.

Argued June 24, 1975.

Decided July 24, 1975.

James E. Nesland, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty. for the Southern District of New York, John D. Gordan, III, Asst. U. S. Atty., of counsel), for appellee.

Steven B. Duke, New Haven, Conn. (Pierce O'Donnell, New Haven, Conn., on the brief), for defendant-appellant.

Before CLARK, Associate Justice,[*] and MANSFIELD and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

Vincent Pacelli, Jr., was convicted on January 31, 1975 after a two-week jury trial before Hon. Charles E. Stewart, United States District Judge for the Southern District of New York, on both counts of a two-count indictment. Pacelli was charged in Count One with a conspiracy with Barry Lipsky to violate the civil rights of a Government witness, Patsy Parks, by causing her death before she could exercise her right to testify, in violation of 18 U.S.C. § 241. Count Two charged the use of force to impede her testimony, in violation of 18 U.S.C. § 1503. On February 28, 1975, Judge Stewart sentenced Pacelli to a term of life imprisonment on Count One and to five years imprisonment on Count Two, to be served concurrently with each other but consecutively to a twenty-year term and a fifteen-year term of imprisonment on two prior narcotics convictions. Pacelli now appeals from the judgment of conviction.

## I. THE FACTS

The appellant here had previously been convicted of the same crimes involving the murder of Patsy Parks but that conviction was reversed by this court, *United States v. Pacelli*, 491 F.2d 1108 (2d Cir. 1974), and Pacelli's petition for certiorari on certain of the issues in that case was denied by the Supreme Court, 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 49 (1974). Judge Mansfield's opinion for this court on the prior appeal details the facts which led to the homicide of Miss Parks. In that case as well as this, the prosecution hinged upon the testimony of Barry Lipsky, who participated in the killing. Pacelli did not testify in his own behalf in this trial and his defense, as in the initial trial, consisted of an attack on the credibility of Barry Lipsky. We find no reason, therefore, to repeat the sordid story except in summary fashion.

Patsy Parks, under subpoena, testified before a grand jury in the Southern District of New York on May 27, 1971 about a box, apparently containing money, which she had kept for Pacelli in her apartment. An indictment charging Pacelli, his wife and two others with narcotic violations was returned by the grand jury. The case was set for trial on February 8, 1972. On February 3, 1972, Government agents sought unsuccessfully to serve Parks with a subpoena for her appearance at the Pacelli trial. Lipsky, who was advised by Parks of the attempted service and her desire to contact Pacelli, testified that he drove to

Pacelli's apartment in New Rochelle in the early morning of February 4, 1972. Upon being advised of the Parks subpoena, Pacelli stated: "It's that box. It's that God-damned box. She has been to the grand jury and she ratted me out. I know what I have to do." The two men then drove in a rented car to New York, stopping to purchase four gallon cans of gasoline, and then proceeded to the "Hippopotamus," a New York discotheque where Parks was drinking with friends while waiting to be contacted by Pacelli. Lipsky told Parks where Pacelli was parked and the three then proceeded to a remote area of Massapequa, New York. Enroute, Pacelli discussed the narcotics case with Parks and offered her money to leave town, which she declined. Finally, Pacelli stabbed Parks in the throat and several times in the chest with a knife until she was dead. Her body was then doused by Pacelli with the gasoline purchased earlier and set on fire, with Lipsky lighting the match. The men then returned to Pacelli's apartment in New Rochelle, disposing of Parks's effects, the empty gasoline cans and the knife and cleaning the car to eliminate bloodstains. Parks's body was found on the morning of February 4th and was identified a week later by footprints and dental charts.

Although the Government's case was dependent upon Lipsky's detailed testimony, it was corroborated in some respects by other witnesses. Parks was placed by witnesses in the Hippopotamus on the night and at the time testified to by Lipsky; the night attendant at the gasoline station identified Lipsky as the purchaser of four gallon cans of gasoline at about 2:30 a. m. one morning; a knife was found in the mud of a bay area two blocks from Pacelli's residence where Lipsky stated they had disposed of the murder weapon. There was also evidence that the same rented car in which the murder was committed was again rented by Pacelli's drug partner, Al Bracer, on February 16, 1972 and was found engulfed in flames two days later in Fairfield, New Jersey, at a time when Lipsky was hiding in Florida. Chemical inspection disclosed that there was gasoline throughout the interior of the car and indicated, although not conclusively, that traces of blood were present on the floor carpet.

## II. LIMITATIONS ON CROSS–EXAMINATION

■ Appellant argues that the trial court erred in precluding the defense from cross-examining Lipsky with respect to three matters of direct significance in assessing his credibility. It is well understood that the admission of evidence on cross-examination is a matter within the discretion of the trial judge. *United States v. Jenkins,* 510 F.2d 495, 500 (2d Cir. 1975); *United States v. Miles,* 480 F.2d 1215, 1217 (2d Cir. 1973) (*per curiam*). Here almost 400 pages of the transcript and two-and-a-half days of trial time were devoted to Lipsky's cross-examination. It is significant that a comparatively small amount of time (perhaps one-third of the cross-examination) was devoted to challenging Lipsky's eyewitness account of the fatal assault upon and the cremation of Patsy Parks. The bulk of the examination was directed to an attack upon Lipsky's credibility and his hostility to Pacelli. In determining whether or not independent evidence of Lipsky's motivation for perjury was admissible, we obviously cannot ignore the evidence already before the jury, as well as that which was available to the defendant and would not have involved diversionary forays into extraneous matters. *United States v. Kahn,* 472 F.2d 272, 279 (2d Cir.), cert. denied, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973); *United States v. Bowe,* 360 F.2d 1, 16 (2d Cir.), cert. denied, 385 U.S. 961, 87 S.Ct. 401, 17 L.Ed.2d 306 (1966). An examination of the record before us indicates that the jury had ample evidence with which to support the defendant's proposition that Lipsky was a vicious criminal with every motive to inculpate Pacelli.

On direct examination, Lipsky related in detail the horrible execution of Patsy

Parks by Pacelli but also discussed his own participation which commenced with alerting the defendant to her appearance before the grand jury. He furthermore obviously knew of Pacelli's intent to kill her; he purchased the gasoline, he took a book of matches from the Hippopotamus and he put the match to the gasoline which caused the conflagration aimed at destroying the corpse and making its identification impossible. Also on direct examination, he admitted to his alliance with Pacelli in the distribution of narcotics. On cross-examination, he admitted that he had taken illegal drugs and was presently using medicinal drugs; he also admitted that he had pleaded to a stock fraud charge in cooperation with the Government. He admitted lying to his lawyers, to juries and to a probation officer who he knew was preparing a pre-sentence report which was to be submitted to a sentencing judge. He admitted to selling stolen books in college and forging his mother's checks. He admitted that his attorney had told him on April 11, 1972, before he went before the grand jury, that an agreement had been reached with the Government that he had complete transactional immunity and would not be prosecuted for anything he told the Government, not for "any damn thing." He admitted that he lied in two previous federal trials in 1972 about his understanding as to whether or not he would be prosecuted. He further admitted that he thought that by testifying against Pacelli he would "get off relatively easy."

In view of this elicitation of the litany of Lipsky's licentious behavior, his corruption and his past perjury, the argument that cross-examination was erroneously restricted in the very areas in which his vulnerability had already been exposed becomes insubstantial and unconvincing.

■ Judge Stewart, it is urged, erroneously refused to permit cross-examination of Lipsky with respect to his testimony in a narcotics trial in June 1972, which, it is alleged, falsely implicated Pacelli. The testimony sought to be introduced was that of one Joseph Nunziata, a deceased New York City detective, who testified in a case involving another defendant, Valentine, which ended in a mistrial. Lipsky testified that he, Valentine and Pacelli had conducted a drug transaction in a New York cafe, "Yellowfingers." Nunziata's testimony, Pacelli contends, was that he had observed both Valentine and Lipsky at the scene, but did not observe Pacelli in the restaurant. On denying Pacelli's post-trial motion for a new trial based on the exclusion of this evidence, Judge Stewart found that this testimony did not establish that "Pacelli was not in fact at the restaurant for at least some of the time in question." A reading of the testimony reveals that Nunziata had a clear view of Lipsky and Valentine, but does not indicate that he could observe all of the persons in the Yellowfingers cafe at the time or that he would have recognized Pacelli had he been present. Nunziata's death, of course, made further explication impossible. Aside from the failure of the Nunziata testimony to establish inconsistency or perjury on Lipsky's part, there was such a plenitude of evidence otherwise demonstrating Lipsky's villainy that we find no abuse of discretion in the action by the court in precluding the admission of the Nunziata testimony. *United States v. Blackwood,* 456 F.2d 526, 530 (2d Cir.), cert denied, 409 U.S. 863, 93 S.Ct. 154, 34 L.Ed.2d 110 (1972).[1]

---

1. Pacelli's brief argues that this testimony was also essential in undermining Lipsky's claim, which was "inextricably related to his testimony about the murder," that he was associated with Pacelli in the narcotics business. Aside from the inconclusive nature of the testimony, the nexus between Lipsky's testimony in the Valentine case and the murder of Parks immediately following her grand jury testimony and subpoena in the Pacelli narcotics trial is, at best, remote. In any case, the record establishes from the testimony of Susan Weyl that Lipsky and Pacelli used her apartment in November and December 1971 to cut and package heroin and cocaine.

The argument that the testimony was essential to establish the animus of Lipsky toward Pacelli is not persuasive. In *United States v.*

As we have already indicated, the jury was fully aware from Lipsky's cross-examination that he had committed perjury in two prior criminal cases. His previous testimony in the June and December 1972 trials was read to the jury. Lipsky admitted that although he knew he had complete immunity, he lied in answering that he had no immunity. Counsel for Pacelli was, however, precluded below from attempting to establish that Lipsky's perjury was suborned by an Assistant United States Attorney. It is urged that the alleged subornation would be material to establish that Lipsky felt free to lie and invent false testimony because he knew that the Government was willing to condone his perjury. We note that in the prior *Pacelli* appeal the same argument was made and was rejected by this court. *United States v. Pacelli, supra,* 491 F.2d at 1120. Although it does not appear in the record, on the argument of this appeal the Government brought to our attention that charges of professional misconduct against the Assistant United States Attorney for the very incidents urged here as outrageous have been examined by the Association of the Bar of the City of New York and that the Assistant has

been exonerated. Aside from this, we deem it well within the discretion of the trial judge for him to have avoided the sidetracking which would inevitably have resulted in diverting the jury from the issue of Pacelli's guilt to what, in effect, would have constituted a separate fact-finding venture as to whether or not a particular Assistant United States Attorney knowingly permitted Lipsky to perjure himself in prior trials. See *United States v. Trejo,* 501 F.2d 138, 140 (9th Cir. 1974); *United States v. Kahn, supra,* 472 F.2d at 279; *United States v. Bowe, supra,* 360 F.2d at 16. See also *Smith v. Illinois,* 390 U.S. 129, 132, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968); *United States v. Catalano,,* 491 F.2d 268, 273 (2d Cir.), cert. denied, 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 48 (1974); *United States v. Mahler,* 363 F.2d 673, 678 (2d Cir. 1966).[2]

Finally, it is urged that the trial court committed reversible error in refusing to permit defense counsel to ask Lipsky whether he had suggested to one Bruce Gordon in January 1972 that he "burn" two witnesses. The evidence, it is argued, not only would have established Lipsky's tendency toward violence but also would have undermined his story

---

*Pacelli, supra,* 491 F.2d at 1118, this court reversed the prior conviction because the Government had failed to disclose a letter from Lipsky to the United States Attorney's office in which he indicated his willingness to testify against Pacelli. In the retrial below, the letter which had been claimed to be vital to impeach Lipsky was not offered in evidence because it would have revealed to the jury that Lipsky's perjured testimony was given in prior trials in which Pacelli was a defendant.

The appellant relies upon *United States v. Haggett,* 438 F.2d 396 (2d Cir.), cert. denied, 402 U.S. 946, 91 S.Ct. 1638, 29 L.Ed.2d 115 (1971). This court has characterized the *Haggett* case as one "of almost complete preclusion of cross-examination as to a witness' motive for testifying, see *United States v. Haggett, supra,* 438 F.2d at 399–400 . . .." *United States v. Blackwood, supra,* 456 F.2d at 530. That is certainly not the case here.

2. Appellant also claims that the evidence of the role of the Assistant United States Attorney in the extension of promises to Lipsky was essential to show that Lipsky perjured himself in the June and December 1972 trials

when he testified that no promises had been made to him in return for his testimony. Lipsky explained that his erroneous testimony in the two trials was the result of confusion as to what offenses the questions about promised immunity were concerned with. Pacelli argues that this explanation could have been decisively undermined by proof of the Assistant United States Attorney's role since it was that very prosecutor who had asked him the crucial questions. However, the defense here had other evidence which it could have used to challenge Lipsky's explanation. Lipsky had testified in *United States v. Sperling,* 506 F.2d 1323 (2d Cir. 1974), cert. denied, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975), prior to this trial of Pacelli for the murder of Patsy Parks, that he was not confused when he denied that any promises had been made to him in return for his testimony. Based upon Lipsky's *Sperling* testimony, this court on the prior appeal herein characterized Lipsky's explanation that his earlier perjury was unintentional as "a blatant lie." 491 F.2d at 1119. Nonetheless, appellant made no effort to utilize this evidence to impeach Lipsky.

that his role in the Patsy Parks murder was passive and was motivated by his fear of Pacelli. The fact that Lipsky was a hardened criminal not adverse to violence was made evident to the jury throughout the trial. Lipsky admitted buying the gasoline and lighting the match which cremated the body. There is no question but that Lipsky was a principal in the murder.[3] There is nothing to justify the argument that Lipsky was in such fear of Pacelli that he participated unwillingly in this brutal killing. The question at issue was not Lipsky's guilt but Pacelli's. We consider the refusal of the court to entertain the question to have been within its discretion, particularly in view of the far-ranging latitude permitted here in the cross-examination of Lipsky.

### III. PSYCHIATRIC EVIDENCE

Pacelli further claims that the trial court committed reversible error in refusing to allow a psychiatrist, Dr. David Abrahamsen, to testify that Lipsky was psychopathic and incapable of telling the truth. Whether or not psychiatric testimony is admissible to impeach the credibility of a witness is within the discretion of the trial judge, see *Hamling v. United States*, 418 U.S. 87, 108, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), and that judgment will not be disturbed unless it is plainly in error. *United States v. Barnard*, 490 F.2d 907, 912–13 (9th Cir. 1973), cert. denied, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974); *United States v. Butler*, 156 U.S. App.D.C. 356, 481 F.2d 531, 535 (1973); *United States v. Benn*, 155 U.S.App.D.C. 180, 476 F.2d 1127, 1131 (1973); *United States v. Rosenberg*, 108 F.Supp. 798, 806 (S.D.N.Y.), aff'd, 200 F.2d 666 (2d Cir.

1952), cert. denied, 345 U.S. 965, 73 S.Ct. 949, 97 L.Ed. 1384 (1953). We see no error in Judge Stewart's determination not to permit the expert psychiatric testimony sought to be introduced. The psychiatrist testified in the absence of the jury at some length, and a study of this examination, the penetrating cross-examination and the questioning by the court itself compels the conclusion that Judge Stewart properly determined that Dr. Abrahamsen's testimony would be of no use to the jury.[4] The credibility of Lipsky was properly a question for the jury. *United States v. Barnard, supra*, 490 F.2d at 913. See also *United States v. Bright*, 517 F.2d 584 (2d Cir. 1975). The court here charged the jury that, since Lipsky was an accomplice by his own admission, his testimony was suspect. All of the eccentric behavior which indicated to the psychiatrist that Lipsky was incapable of telling the truth was before the jury. Lipsky admitted to the jury that he shot out his television set with a gun because the picture rolled; that he threw a set of scales into Biscayne Bay because of his inability to lose weight; that he held a gun to his brother's head after an argument; that he lost his temper at inanimate objects; and that he described himself in a letter to his sister, which was read to the jury, as "a violent, vindictive, warped-minded cynic of a magnitude that you have absolutely no conception of." He stated that in jail he wished he could go near the "psychos" to "steam them up and laugh at them . . . ." He admitted that he had testified in a prior case that he had used cocaine as often as 20 times in a 24-hour period. He admitted that in jail he had banged his head against a wall because he was angry at an officer.

---

**3.** Examples of Lipsky's unusual behavior recited in Part III of this opinion also suggest a capacity for violence on his part.

**4.** A pretrial motion for a psychiatric examination of the witness Lipsky was denied by Judge Stewart. This was properly within his discretion. *United States v. LaBarbera*, 463 F.2d 988, 990 (7th Cir. 1972); *United States v. Russo*, 442 F.2d 498, 503 (2d Cir. 1971), cert. denied, 404 U.S. 1023, 92 S.Ct. 669, 30 L.Ed.2d

673 (1972). It is noteworthy that, on the voir dire, Dr. Abrahamsen testified that an examination of Lipsky would not assist him in determining whether he was telling the truth since Lipsky would be self-serving and defensive. In December 1972, Lipsky was examined by two psychiatrists who found no mental defect which interfered with Lipsky's ability to understand the charges made against him, consult with his counsel or cooperate with the court.

He admitted to the use of false names and to a predilection for watching horror movies, during which he would make faces and noises at the TV screen. This recitation of Lipsky's odd behavior and criminal propensities was all before the jury and the testimony of the psychiatrist could only have involved the jury in a trial within a trial causing further irrelevant distraction. The psychiatrist admitted on cross-examination that 12 average people on a jury would, without the warning of a psychiatrist, recognize that Lipsky's testimony had to be reviewed "very carefully indeed." He also stated that a large portion of criminals was psychopathic, so that his diagnosis of Lipsky is hardly surprising. In any event, since he testified that Lipsky, as a psychopath, was unlikely to tell the truth unless it coincided with his own self-interest, it is difficult to see how he could determine, based upon Lipsky's own testimony, what Lipsky's self-interest might be at any particular time or place.[5]

■ Pacelli's other arguments on appeal are without merit.[6]

Affirmed.

---

5. Had Dr. Abrahamsen been permitted to testify before the jury the jury might well have been confused by his testimony, as an examination thereof makes clear. Although a complete reading of the transcript establishes that Dr. Abrahamsen's testimony was properly excluded, one example of the reasoning which prompted the decision of Judge Stewart is illuminating. In his testimony below Lipsky was asked: "What does [the oath] mean?" His answer was: "It means you sit here and swear to tell the truth, to the best of your ability and the best of your knowledge and the best of your memory." Dr. Abrahamsen testified that this answer indicated to him that Lipsky "doesn't understand really what it means to tell the truth." The next several pages of the transcript illustrate the inability of the judge to understand the psychiatrist's conclusion. That inability is shared here. How the doctor's conclusion would have been of aid to the jury is far from clear.

6. Appellant suggests, as he did on the prior appeal, that he could not have been convicted on Count One of the violation of 18 U.S.C. § 241 because there is no "right" to be a federal witness. This contention was properly rejected on the prior appeal. 491 F.2d at 1113–15. Appellant also argues that the Government in any case proved no violation of section 241 since it failed to establish that the specific purpose of the conspiracy was to deprive Patsy Parks of her right to testify at trial. We see no need to recapitulate the Government's case against Pacelli. It is enough to say that the Government clearly showed that Pacelli killed Patsy Parks to prevent her from testifying against him.

Appellant also claims (a) that, unless both of the two alleged coconspirators are guilty, neither can be; (b) that, since there was no evidence that Lipsky knew Parks was to be killed to prevent her from exercising her right to testify, Lipsky could not be guilty of the crime; and (c) that if Lipsky was not guilty, neither was Pacelli. The evidence, however, clearly demonstrates that Lipsky knew that Parks was to be killed to prevent her from testifying. Pacelli told Lipsky after being informed of the existence of the subpoena that Parks had "ratted [him] out" and that Pacelli knew what he had to do, which Lipsky interpreted as an expression of an intent to do away with Parks.

Appellant argues that Judge Stewart abused his discretion in imposing sentence, since he inadequately disclosed his reasons for imposing a severe sentence. Whatever may be the trial judge's duty in explaining a sentence, see *Dorszynski v. United States*, 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974), it is clear that Judge Stewart acted properly here. He stated, among other reasons, that he was imposing a severe sentence because of the brutality of the offense, a justification which seems to us adequate under the circumstances. Appellant also argues that Judge Stewart should not have considered Pacelli's two prior convictions and that the sentences therefor were influenced by Pacelli's guilt in the murder of Patsy Parks. There is no merit to the first portion of this contention and the second must be rejected because it is based upon mere speculation. Finally, appellant argues that the rule of *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) was violated since Pacelli was sentenced below to a term of life imprisonment to run consecutive to Pacelli's sentences on two prior narcotics offenses, whereas the sentence on the first conviction for the murder of Patsy Parks was to run consecutive to only the first of these prior convictions. Assuming that there was any actual increase in the sentence (the two sentences for the Parks murder being both for the length of Pacelli's life), there is no violation of *Pearce* here since the second of Pacelli's narcotics convictions was not returned until after Pacelli was sentenced for the first time on the murder charge. *Pearce* does not require a sentencing court to ignore an intervening conviction on another charge.