UNITED STATES of America, Appellee,

v.

Frank MOTEN, Angel Rodriguez, William Hightower, Sidney Foster, Joseph Sampson, Lois Sampson, Yvonne Alvarez Schennault, Don Wilson, James Laws, Tommy Davis, John Morris, Lawrence Mitchell, Raphael Bonilla and Charles Cowpers, Defendants-Appellants.

Nos. 1206, 1207, 1212 to 1220, 1230 and 1231, Dockets 77–1085 to 77–1094, 77–1113, 77–1114, 77–1117 and 77–1119.

United States Court of Appeals, Second Circuit.

Argued June 8, 1977.

Decided Sept. 6, 1977.

Certiorari Denied Nov. 14 and Nov. 28, 1977.

See 98 S.Ct. 489, 531.

Daniel J. Beller, Asst. U. S. Atty. (Robert B. Fiske, Jr., U. S. Atty. for the Southern Dist. of New York, Lee S. Richards, Constance Cushman, Robert J. Jossen, Asst. U. S. Attys., New York City, of counsel), for appellee.

Edward M. Chikofsky, New York City (Ivan S. Fisher, New York City, of counsel), for defendant-appellant Moten.

Harold O. N. Frankel, New York City, for defendant-appellant Hightower.

Victor J. Herwitz, New York City, for defendant-appellant Foster.

Frederick H. Cohn, New York City, for defendant-appellant Joseph Sampson.

Hudson H. Reid, New York City, for defendant-appellant Lois Sampson.

Royal B. Martin, Jr., Chicago, Ill. (Harris, Burman & Sillets, Chicago, Ill., Ira M. Burman, Chicago, Ill., of counsel), for defendant-appellant Schennault.

Daniel J. Kornstein, New York City (Baer & McGoldrick, New York City), for defendant-appellant Wilson.

Howard J. Diller, New York City (Diller, Schmukler & Asness, New York City), for defendant-appellant Laws.

Nicholas Figueroa, New York City, for defendant-appellant Davis.

Martin E. Gotkin, New York City, for defendant-appellant Morris.

Irving Anolik, New York City, for defendant-appellant Mitchell.

Brian C. Baker, New York City (Greenfield & Baker, New York City), for defendant-appellant Bonilla.

William L. Richman, New York City, for defendant-appellant Cowpers.

Before LUMBARD, MULLIGAN and GURFEIN, Circuit Judges.

MULLIGAN, Circuit Judge:

This is an appeal by 13 defendants [1] from judgments of conviction entered on January 13, 21 and 31, 1977 in the United States District Court for the Southern District of New York after a 14-week trial before Hon. Richard Owen, United States District Judge and a jury. The indictment was filed on April 5, 1976 charging the 13 appellants and 20 other defendants with violations of the federal narcotics laws.

Count One charged all 33 defendants with conspiracy to violate the narcotics laws from January 1, 1968 until the filing of the indictment in violation of 21 U.S.C. §§ 173, 174 and 846. Counts Two and Three charged Juan Antonio Alvarez and Frank Moten with engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848. (Alvarez is a fugitive who did not appear for trial, forfeiting a $100,000 surety bond and a $400,000 personal recognizance bond secured by Florida property.) Counts Four through Forty charged 30 defendants with substantive narcotics crimes.

Trial commenced on August 10, 1976 with respect to 22 defendants.[2] On November 12, 1976, after six and one-half days of deliberation, the jury returned verdicts of guilty against the 13 appellants. On January 13 and 21, 1977, Judge Owen imposed sentences, all of which were concurrent un-

---

1. Thirteen defendants have perfected their appeals. Angel Rodriguez died in Atlanta Penitentiary during the pendency of this appeal.

2. John Capra, Leoluca Guarino and Steven Dellacava were severed over the Government's opposition. They had refused to cooperate with their counsel and had engaged in obstructionist tactics which were disruptive. Moreover, certain wiretap evidence was inadmissi-

ble against them and could have been prejudicial to other defendants in a joint trial. Helen Kellem (illness) and Solon Glaze (death in counsel's family) were also severed. Three defendants, Luis Sureda, Michael Parker and Ann Reynolds pleaded guilty and testified on trial for the Government. The Government filed *nolle prosequis* with respect to Eduardo and Lazaro Yaujar. Another defendant, Al Williams, has not been apprehended and is a fugitive.

less otherwise noted, as indicated in the margin.[3]

## I THE FACTS.

The evidence showed a massive narcotics organization which distributed hundreds of kilos of heroin and cocaine throughout major centers in New York, Miami, Washington, D.C. and Chicago from 1968 to 1975. The core group of wholesale middlemen purchased cocaine and heroin in bulk from importers or other suppliers. The middlemen in turn sold the drugs to the distributors who eventually sold them to their customers. The roles of the appellants and other defendants are best understood by an organizational chart prepared by the Government outlining the three-level structure of the conspiracy. It is reproduced in Appendix A of this opinion.

The Government's evidence revealed that Juan Antonio Alvarez and Angel Rodri-guez, who lived in Miami, sold about 80 kilograms of cocaine annually between 1968 and 1974. The principal suppliers of heroin were Sebastian Intersimone, John Capra, Leoluca Guarino and Steven Dellacava. The middlemen or core group consisted of Jack Brown aided by Frank Moten and Brown's son-in-law, Michael Parker. Brown was the key figure in the conspiracy. He had a long criminal record dating back to 1944, graduating from shoplifting to narcotics dealing and culminating in a conviction in Washington, D.C. in 1960 for violation of the federal narcotics laws. He was incarcerated in Atlanta Penitentiary where he met Guarino who was later to become a major source of heroin for the conspiracy. Upon his release from Atlanta in 1964, Brown returned to New York and shortly thereafter was buying heroin and cocaine on a wholesale basis. He sold through organized channels of distribution to custom-

| 3. | Defendant (Total Sentence) | Counts | Term of Imprisonment Incarceration | Fine |
|---|---|---|---|---|
| 1. | Frank Moten (25 years; $50,000) | One | 15 years concurrent | |
| | | Eight | 15 years | $25,000 |
| | | Nine | 10 years | $25,000, consecutive to Count Eight |
| 2. | William Hightower (12 years) | One | 12 years | |
| | | Sixteen | 12 years | |
| | | Seventeen | 12 years | |
| | | Nineteen | 12 years | |
| 3. | Sidney Foster (10 years) | One | 10 years | |
| 4. | Joseph Sampson (10 years) | One | 10 years | |
| | | Twenty | 10 years | |
| 5. | Lois Sampson (12 years) | One | 12 years | |
| | | Nineteen | 12 years | |
| | | Twenty | 12 years | |
| | | Twenty-One | 12 years | |
| 6. | Yvonne Schennault (20 years; $45,000) | One | 5 years | $20,000 ⎫ consecutive |
| | | Thirteen | 15 years | $25,000 ⎬ |
| 7. | Don Wilson (8 years) | One | 8 years | ⎭ |
| | | Fifteen | 8 years | |
| 8. | James Laws (10 years) | One | 10 years | |
| | | Twenty-Four | 10 years | |
| 9. | Tommy Davis (2 years) | One | 2 years | |
| | | Twenty-Two | 2 years | |
| | | Twenty-Three | 2 years | |
| 10. | John Morris (10 years) | One | 10 years | |
| 11. | Lawrence Mitchell (12 years) | One | 12 years | |
| | | Twenty-Seven | 12 years | |
| 12. | Raphael Bonilla (5 years) | One | 5 years | |
| | | Twenty-Nine | 5 years | |
| 13. | Charles Cowpers (12 years) | One | 12 years | |
| | | Twenty-Eight | 12 years | |

ers in New York as well as to others who came regularly from Chicago and Washington, D.C. to make purchases. From 1968 through 1972 Brown lived at various New York apartments and used others to "stash" narcotics. He was indicted in the Southern District of New York in April 1973 and reading about his indictment in the press, he proceeded to go "underground" in the New York area. In November 1973, he moved to Miami but continued to purchase and sell cocaine, utilizing his son-in-law Parker to make deliveries. In December 1974, he left Florida seeking to avoid detection but on April 6, 1974, fearful that his life was in danger, Brown surrendered to the Government, agreeing to cooperate in exchange for protection.

Brown was the principal Government witness at this trial. Some 35 other witnesses testified for the Government including five other conspirators: Michael Parker, Luis Sureda, Ann Reynolds, Marion Ladd and Estelle Tompkins. Parker, who was Brown's principal lieutenant and confidant, testified that he had either delivered drugs to or had observed drug transactions by almost all of the defendants on trial.[4] The Government also produced more than 200 documentary exhibits including travel receipts, telephone toll records, photographs, letters and papers seized from the defendants. It is beyond cavil that hundreds of kilos of drugs worth several million dollars passed through the conspirators.

## II SINGLE OR MULTIPLE CONSPIRACIES.

All of the appellants challenge the propriety of having been tried together, either because they urge that separate conspiracies were proven at trial as opposed to the single conspiracy charged in the indictment, or because of the alleged unfairness inher-

ent in a "mass trial" such as the one under review.

The appellants argue that the Government proved multiple conspiracies between Brown and various defendants based upon their geographical locations: New York, Miami, Chicago and Washington, D.C. They further allege a separation by virtue of the fact that two drugs, cocaine and heroin, were involved in the sales. They all urge in substance that they were prejudiced by the "spill-over" of cumulative evidence with respect to each of the numerous defendants. We do not find any abuse of discretion in the denial of severance sought by appellants here. *United States v. Projansky*, 465 F.2d 123, 138 (2d Cir.), cert. denied, 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972).

The issue as to whether a large continuing drug operation such as that disclosed by the evidence here constitutes a single conspiracy or multiple conspiracies among the participants is hardly novel in this circuit. The business of narcotics trafficking falls of necessity into the familiar pattern of the so-called chain conspiracy. It generally involves, as it did here, a group of importers or suppliers selling on a regular basis to a core of well-financed middlemen who in turn sell to another group of distributors who eventually sell at retail to the small pusher or addict. The profits are enormous and only exceeded by the ultimate human misery, degradation and crime spawned by the process. As we indicated in *United States v. Bynum*, 485 F.2d 490 (2d Cir. 1973), vacated on other grounds, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974), the suppliers know that the business does not end with their sale to the middlemen, and the distributors know from the vast amounts purchased and its ready availability that their seller has a source of supply. "The fact that not all of the defendants may have known and worked directly with

---

4. For example, Parker testified that he made actual deliveries of drugs to John P. Morgan, Don Wilson, Lawrence Mitchell and Raphael Bonilla. He was also present at various loca-

tions when drugs were obtained by Sidney Foster, Tommy Davis, Joseph Sampson and William Hightower.

all of the others is not significant since it is clearly established that each knew from the scope of the operation that others were involved in the performance of functions vital to the success of the business." Id. at 496.

The fact that two drugs, cocaine and heroin, were involved is not significant. *Bynum*, which is factually similar to this case, involved both cocaine and heroin. Moreover, nine of the twelve distributor appellants—Schennault, Hightower, Foster, Joseph and Lois Sampson, Cowpers, Morris, Davis and Bonilla—purchased both heroin and cocaine. The relationships here were neither casual nor spasmodic and no defendant was involved in simply a single sale.[5] While appellant Moten claims that only two sales by him were proven, Brown also testified that he had confided to Moten the scope of his drug activities as well as the identities of his customers and his sources. Moreover, Moten had extensive financial dealings with Brown from 1966 through 1972 exchanging small denomination bills for large bills which Brown used to pay his suppliers. Moten further received from Brown some $60,000 in small bills each month for safekeeping. Moten's full scale participation in the overall conspiracy was well established. Similar claims of minor participation by both Morris and Mitchell evanesce upon examination of the record. Morris and his partner Glaze were purchasing heroin and cocaine from Brown in ounce quantities on a weekly basis from 1968 to 1972. Morris was certified by both Parker and Marion Ladd as a visitor to Brown's apartment on several occasions. Mitchell not only was a longtime friend of Brown, Morris and Glaze but borrowed money from Brown and purchased substantial amounts of cocaine from Brown from the fall of 1972 until March 1973. Parker also delivered cocaine to Mitchell in New Jersey. In Feb-

ruary 1973, Mitchell purchased a kilo of cocaine from Brown in Orangeburg, New York.

The claim that the conspiracies became discrete by reason of the territorial separation of the distributors must be rejected. The evidence revealed that the out-of-town conspirators all came to Brown in New York at regular intervals to sell or purchase drugs. After Brown moved to Florida, Parker would deliver drugs to Washington for him and other customers came to see him personally for deliveries. The point is that Brown was obviously the kingpin of a single conspiracy regularly dealing with an established cast. His activity was central to the involvement of all and whether the drugs ultimately reached the consumer in some other city was not logically pertinent to the operation of the continuing relationship among the parties.

It is significant that no challenge has been raised by any appellant to the trial court's charge on the question of a single conspiracy. Viewing the proof in the light most favorable to the Government, there was sufficient evidence to permit the jury to find the single conspiracy alleged. *United States v. Taylor*, 562 F.2d 1345, 1351 (2d Cir. 1977). It is obvious that the jury believed the testimony of Brown, who was in the best position to know the perimeters of the conspiracy and the extent of the participation of the defendants. That evidence was bolstered, as we have indicated, by other witnesses and documentary evidence. The size and continuity of the business, the mutual interdependence of the defendants and the immense quantity of drugs involved all make this case similar to others in which we have found single rather than multiple conspiracies. *United States v. Taylor supra; United States v. Magnano*, 543 F.2d 431 (2d Cir. 1976); *United States v. Tra-*

---

**5.** Six of the twelve distributor-appellants— Hightower (1966–1974), Foster (1969–1974), Joseph Sampson (1967–1972), Lois Sampson (1968–1973), Cowpers (1966–1970; 1973–1974) and Bonilla (1968–1973) were involved in drug transactions with the core for a period of five years or more. The remaining six—Schennault (1971–1974), Wilson (1971–1974), Laws (1971–1972), Morris (1968–1972), Mitchell (1972–1973) and Davis (1968–1972)—sustained their dealings over substantial periods of years as well.

*munti*, 513 F.2d 1087 (2d Cir.), cert. denied, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *United States v. Ortega-Alvarez*, 506 F.2d 455 (2d Cir. 1974), cert. denied, 421 U.S. 910, 95 S.Ct. 1559, 43 L.Ed.2d 775 (1975); *United States v. Mallah*, 503 F.2d 971 (2d Cir. 1974), cert. denied, 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975); *United States v. Agueci*, 310 F.2d 817 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963).[6]

The appellants have relied principally upon *United States v. Miley*, 513 F.2d 1191 (2d Cir.), cert. denied, 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 62 (1975) and *United States v. Bertolotti*, 529 F.2d 149 (2d Cir. 1975) for the proposition that multiple conspiracies were involved. But these cases were unlike the large scale heroin-cocaine traffic cases which involved the vertical chain of importation, purchase, adulteration, packaging, distribution and eventual street pushing which we have recognized at least since *Agueci* to be properly encompassed in an indictment charging a single conspiracy. Thus in *Miley*, the trafficking involved domestically produced hallucinogenic drugs sold in small dollar amounts over a four-month period. While purchasers dealt with the same core group, there was no reason for them to be aware of the existence of each other. 513 F.2d at 1207. *Bertolotti* is atypical since the alleged single conspiracy was not directed primarily to the sale and disposition of drugs but rather to thefts of cash from drug dealers. 529 F.2d at 155. There was no reason for different groups to expect the participation of others.[7]

## III

The appellants all urge that assuming *arguendo* a single conspiracy was established, their convictions should be reversed because of the inherent unfairness of subjecting 22 defendants to a massive trial lasting 14 weeks. The argument is made that it was virtually impossible to expect the jury to recognize the limitations of evidence to certain defendants over such a long and tedious period of time ultimately resulting in a 9500 page record. In *United States v. Sperling*, 506 F.2d 1323 (2d Cir. 1974), cert. denied, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975), this court, while affirming the convictions of the defendants, did caution the Government that it might be unnecessarily exposing itself to reversal by combining a dozen or more defendants in a single trial on the theory of a single conspiracy when the acts could be more reasonably perceived as multiple conspiracies. Id. at 1340–41. That warning was repeated in *Miley* and *Bertolotti, supra*, although in the latter cases as we have noted the court found that multiple conspiracies did exist. We consider this argument to be the most serious raised on this appeal, meriting close attention.

Major drug conspiracies unfortunately have become almost commonplace in urban centers and as the profits have mounted, the participants have proliferated. The mere fact that those so involved are indicted and tried together when accused of a common conspiracy does not per se render their convictions suspect. We have rejected

---

**6.** We note that counsel for appellant Joseph Sampson in his reply brief "agrees that in the light of the law in this Circuit, the jury had a perfect right to find a single conspiracy."

**7.** Appellant Moten also relies on the writer's concurring opinion in *United States v. La Vecchia*, 513 F.2d 1210, 1221 (2d Cir. 1975). That case involved the sale of counterfeit bills rather than drug trafficking and it was on that basis that a separate conspiracy with respect to one defendant was urged.

I think that the basic error here is equating the sale of counterfeit money with illegal drug trafficking. In numerous cases, this court has described the typical functioning of the drug chain conspiracy—the progressive steps of importation of raw drugs, adulteration, packaging, wholesaling and eventual street retailing. In these cases, the very size of the sales and the circumstances of distribution at various levels were persuasive of the existence of a continuing chain conspiracy and the knowing participation of the actors at each level in the ongoing venture. Id. at 1220–21. Finding no prejudice by spillover, this opinion concurred in the affirmance of Herbie Kurshenoff's conviction.

such contentions in comparable cases. *United States v. Tramunti, supra* (32 indicted, 18 tried); *United States v. Aviles*, 274 F.2d 179 (2d Cir.), cert. denied, 362 U.S. 974, 80 S.Ct. 1057, 4 L.Ed.2d 1009 (1960) (37 indicted, 17 tried); *United States v. Stromberg*, 268 F.2d 256 (2d Cir.), cert. denied, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959) (46 indicted, 19 tried). By the same token we do not accept the proposition that because of the convenience of the Government, the conservation of judicial energy and the expense of multiple trials, the discretion of the United States Attorney in indicting numerous defendants, even in a single conspiracy drug case such as this, should be unfettered. There can be no litmus paper test depending upon the number of defendants and the expected length of the trial. Rather, the inquiry must be whether the defendants in this case were afforded a fair trial. Was the jury reasonably able to consider the evidence as to the guilt of each, independent of the evidence as to guilt of his fellow defendants. Have the defendants been able to establish, as they must, that failure to sever prejudiced their right to a fair trial. *United States v. DeSapio*, 435 F.2d 272, 280 (2d Cir. 1970), cert. denied, 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971).

■ Although this was a comparatively long trial and involved numerous defendants, the issues were not so complicated as to be beyond the comprehension of the jury. This was not an antitrust or securities fraud case involving esoteric theories of law and complex business transactions beyond the ken of the ordinary juror. The purchase and sale of hard drugs is basically a simple operation, easily understandable particularly in a case such as this when the principal malefactor has testified as a Government witness. The basic question was whether or not Brown's testimony should be credited. None of the appellants testified in his own behalf. Brown testified in detail for some three and one-half days as to his dealings with each of the appellants here and he was in turn cross-examined by them for seven days. After nine weeks of testimony, the Government summed up the facts for four-and-one-half days including the rebuttal summation, and the defense for seven days. The Judge marshalled the evidence as to each defendant for one day and another day charged the law. Thus after a long trial the jury was given a full review of the facts and it then proceeded to deliberate for six-and-one-half days before reaching a verdict. That it was able to differentiate among the defendants is attested by its verdicts.[8] In view of the relative simplicity of the proof, the review of the evidence provided by counsel and the court, the unhurried deliberation of the jury and the discrimination it exercised, we cannot agree with the claims made that the determination of individual guilt was beyond the competence of the jury. Counsel for defendants did commendably cooperate and present a coordinated defense. Their warm commendation of the trial judge for his conduct of a long multiple defendant litigation after the verdict of the jury suggests that the appellate posture now assumed hardly comports with the facts.[9]

---

**8.** The jury acquitted the defendants Donald O'Dood, Marion Dunmore, John P. Morgan and Nelson Alvarez. They failed to reach a verdict with respect to Bernard Brightman, and similarly failed on three counts against Frank Moten. Moreover, William Hightower, Sidney Foster, Yvonne Schennault, John Morris and Raphael Bonilla were each acquitted on one of the counts against them.

**9.** We do not overlook the fact that after the trial the forelady of the jury wrote a letter to the Chief Judge of the Second Circuit com-plaining that it was impossible to reach a fair and just verdict for the twenty-two defendants involved. The letter does not suggest that any improper or extraneous influence was employed and therefore it cannot be considered the basis for impeaching the verdict. Fed.R. Evid. 606(b); see *United States v. Dioguardi*, 492 F.2d 70, 78–81 (2d Cir.), cert. denied, 419 U.S. 829, 95 S.Ct. 49, 42 L.Ed.2d 53 (1974). The letter was the aftermath of a post-trial party given by defense counsel to which the forelady was invited.

■ The appellants have failed to establish any specific prejudice by denial of their motions for severance. Thus proof of prior drug dealing by individual defendants with Brown at a time previous to commencement of the conspiracy charged was clearly admissible to show the basis for the existence of the conspiracy charged and the mutual trust which existed between Brown and his customers. It was therefore admissible against all the defendants to show the nature and existence of the conspiracy charged. *United States v. Araujo,* 539 F.2d 287, 289 (2d Cir. 1976); *United States v. Cohen,* 489 F.2d 945, 949 (2d Cir. 1973). The trial court, however, in its charge limited the admission of preconspiracy criminal acts only as against the party involved.

■ Appellants further urge that they were prejudiced by the admission in evidence of testimony by Brown that he knew of six narcotics dealers who had been murdered. On direct examination, Brown testified that his reason for cooperation with the Government was that he was concerned about his personal safety and that he was tired of running. On cross-examination the defendants attempted to show that he had a variety of personal motives for testifying against individual defendants. On redirect the Government sought to bolster Brown's motivation by establishing that he knew of six other narcotics dealers who had been murdered. Since there was no indication or suggestion that any of the appellants had participated in these killings or, with one exception, even knew the victims, it cannot be seriously urged now that evidence of crimes in which they did not participate was so prejudicial as to arouse "the irrational passions of the jury." *United States v. Kaufman,* 453 F.2d 306, 311 (2d Cir. 1971); *United States v. Bynum, supra,* 485 F.2d at 498–99.

■ We further emphasize that the discretion of the trial judge in determining whether or not severance is appropriate must be accorded considerable respect. He was on the scene and had the opportunity at first hand to determine whether the trial was manageable. *United States v. Aviles, supra,* 274 F.2d 194. The district court did sever five defendants in this case, see n. 1 *supra,* and during the trial defendants were given the opportunity to make further motions for severance. In sum, we conclude that no prejudice has been shown; that the marshalling of evidence by the district court and the charge given carefully advised the jury that each defendant was to be considered on the basis of the evidence adduced against him; and that the verdicts ultimately rendered establish that the jury could perform its task of making discrete judgments. *United States v. Corr,* 543 F.2d 1042, 1052–53 (2d Cir. 1976). We conclude that the trial was fairly held and the defendants fairly convicted.

IV

Other issues have been raised on this appeal by particular defendants or groupings of defendants which require discussion.

A) Appellants Sampson, Hightower and Wilson claim that the district court abused its discretion by denying Criminal Justice Act funds to permit a psychiatrist to study Brown's testimony and, if necessary, to examine Brown himself. As part of Brown's 3500 material, the Government turned over to defense counsel a two-page letter written by Brown to the FBI in which he indicated that certain people were trying to kill him, perhaps by the use of a "laser light." Counsel for Joseph Sampson applied to Judge Owen for funds to retain a psychiatrist to evaluate the letter, the text of which was read to the jury with minor redactions of names. Judge Owen approved the payment and Dr. Harvey Greenburg made a report which, while not particularly enlightening, concluded that there was some evidence of paranoia. It was at this juncture that Sampson's counsel applied for further funds to study Brown's trial testimony which might form the basis of an offer of proof. Judge Owen, after

studying the letter, refused to authorize further funds.

■ The determination as to whether or not psychiatric testimony was admissible to impeach the credibility of Brown was clearly within the discretion of the trial judge. *United States v. Pacelli*, 521 F.2d 135, 140 (2d Cir. 1975), cert. denied, 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976); see *Hamling v. United States,* 418 U.S. 87, 108, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). We find no abuse of that discretion in this case. The motivation and credibility of Brown were best left to the jury to probe. *United States v. Bright,* 517 F.2d 584, 586 (2d Cir. 1975). The jury had ample opportunity to make that determination here in view of their extended exposure to Brown who spent some twelve days in direct, cross, and redirect examination in their presence.

More specifically we look to the statute itself, 18 U.S.C. § 3006A(e)(1). In *United States v. Durant,* 545 F.2d 823, 827 (2d Cir. 1976), we noted that

> the purpose of the Act, confirmed by its legislative history, is clearly to redress the imbalance in the criminal process when the resources of the United States Government are pitted against an indigent defendant. Therefore, the phrase "necessary to an adequate defense" must be construed with this commendable purpose in mind. "Necessary" should at least mean "reasonably necessary," and "an adequate defense" must include preparation for cross-examination of a government expert as well as presentation of an expert defense witness.

(footnote omitted).

It is further significant that none of the seven retained attorneys sought to introduce expert testimony as to Brown's alleged paranoia. Had the district court permitted such testimony on behalf of the defendant Sampson, then it could well be anticipated that the Government would present contrary testimony thus creating a "trial within a trial". We find no abuse of discretion

in Judge Owen's refusal to authorize additional funds for further psychiatric reports.

■ B) Appellant Mitchell urges that his conviction be reversed because Judge Owen excused a juror without giving all counsel an opportunity to be heard. Some seven weeks after the commencement of trial, counsel for one of the defendants advised the Government that one of the jurors had sought to contact a defendant. The matter was brought to the attention of the district judge who interviewed a relative of one of the defendants who had been approached. Thereafter he interviewed the juror in the presence of Government counsel as well as the defense counsel who had brought the matter to the Government's attention. He then excused the juror and thereupon advised all defense counsel of the reason for his action. He then conducted a voir dire of each of the other jurors, having first requested suggestions from defense counsel as to the proper method of proceeding. Finding no taint in the others, the trial proceeded. This court has already found that the discharge of this juror and the designation of the alternate was proper. *In the Matter of A Grand Jury Subpoena Served Upon David Doe,* 551 F.2d 899, 901 (2d Cir. 1977). The argument now made is that the district judge should have called in all defense counsel prior to his discharge of the juror. It is well understood that the substitution of an alternate juror for reasonable cause is the prerogative of the court and does not require the consent of counsel. *United States v. Floyd,* 496 F.2d 982, 990 (2d Cir.), cert. denied, 419 U.S. 1069, 95 S.Ct. 654, 42 L.Ed.2d 664 (1974); *United States v. Ellenbogen,* 365 F.2d 982, 989 (2d Cir. 1966), cert. denied, 386 U.S. 923, 87 S.Ct. 892, 17 L.Ed.2d 795 (1967). This court having already found reasonable cause, the argument becomes frivolous.

■ C) Appellant Mitchell also argues that he was denied the effective assistance of counsel because his attorney was suffering from an injury to his finger received in July prior to trial. As a result of this

injury, Mitchell's counsel received hospital treatment on September 1, 1976 and thus was not present to represent Mitchell for that day of the trial. When trial resumed on the morning of September 1, co-counsel advised the court that Mitchell's counsel had been hospitalized. Mitchell consented to have the trial proceed since his name would not be mentioned in any evidence given that day, and he agreed that co-counsel could represent him that day. The court instructed co-counsel to review the minutes of that day's proceeding with both Mitchell and his counsel upon his return. The argument now made is that Mitchell's counsel was "wracked [sic] with pain" throughout the proceeding, required "major surgery" and that therefore Mitchell had been deprived of his Sixth Amendment right to counsel. The record is barren of any request by Mitchell's counsel to be relieved because of illness. There is no suggestion of how Mitchell was prejudiced at any point during the trial. Furthermore, Mitchell consented to the procedure and was represented by counsel. The argument again is meritless.

■ D) Appellants Joseph and Lois Sampson, who were married, argue that they were entitled to a severance from each other and that the district court's denial of their motion deprived them of a fair trial. Joseph Sampson, while admitting that it was not per se error to join husband and wife as co-defendants in a conspiracy case, *United States v. Figueroa-Paz*, 468 F.2d 1055, 1057 (9th Cir. 1972), and admitting that no question of privilege arose during the trial, now argues that the evidence on trial indicates that his wife was much more culpable than he and that he was nothing more than a bystander. To establish this, he argues, would have required him to adopt the testimony of Ann Reynolds (Lois Sampson's sister) who testified for the Government, thus assisting in the conviction of his wife. A review of the evidence of both Brown and Parker reveals that Joseph Sampson could hardly be described as an innocent bystander. On the contrary,

Brown's evidence indicated that Joseph Sampson was using his wife as a courier in 1968. Parker testified that he had not only picked up money from him in payment for drugs in August 1970, but that he had seen Sampson in Brown's apartment more than twenty times in 1971 and 1972 where he both bought and used cocaine. Had Sampson, who did not testify in this case, been given a separate trial it is purely speculative as to what Ann Reynolds would have testified to or if she would have testified at all.

Lois Sampson paradoxically argues that she was prejudiced by the evidence adduced against her husband and since they were joined together by the "marital knot" the jury would infer that they were joined together by the "criminal knot." This is, as we have indicated, no sufficient reason to require severance. *United States v. Figueroa-Paz, supra.* Moreover, in this very case the jury did convict Cowpers and acquit his wife Marion Dunmore.

The trial court found no prejudice to either Sampson and denied their motions for severance both before and during trial. Neither has shown sufficient prejudice here to warrant a finding that the court below abused its discretion. *United States v. Di Giovanni*, 544 F.2d 642, 644–45 (2d Cir. 1976).

■ E) Appellant Bonilla claims that he was denied due process, the effective assistance of counsel and the right to be confronted by his accusers because on eleven occasions the court held "*ex parte* proceedings with Government counsel." Five of these conferences involved applications by the Government under 18 U.S.C. § 3500(c) which are required to be in camera. Two others related to the removal of the juror which we have already discussed. We have read the transcripts of the remaining four conferences and find nothing at all which could possibly have prejudiced Bonilla.

■ F) Appellant Foster urges that the admission of testimony by Estelle Tompkins

relating to a heroin transaction in Washington, D.C. in 1968 constituted impermissible hearsay and was sufficiently prejudicial as to require reversal. There was testimony from Brown which indicated that Foster and Hightower purchased cocaine and heroin from Brown between 1968 and 1974. Foster came to New York at increasingly frequent intervals purchasing both heroin and cocaine. Parker testified that he acted as a courier for Brown and delivered cocaine to Foster in Washington in 1973 and 1974. Estelle Tompkins was offered by the Government as a corroborative witness to the Foster-Hightower partnership. She testified that in 1968 she visited the barbershop of a former common law husband, George Willis in Washington, D.C. to get some drugs. Miss Tompkins recounted that she " . . . had to wait for drugs from George and he was out at that time," specifying that "out" meant that he had no drugs. She then testified that Hightower and Foster came down the street and called George outside. George came back, finished cutting a customer's hair, took Tompkins downstairs and supplied her with 20 capsules of heroin. Foster argues that since there was no showing that Tompkins had any personal knowledge that Willis had no heroin, it had to be based upon a statement by Willis and therefore it was inadmissible hearsay. The Government does not contest that objection was made to the admission of the testimony nor can it be denied that it was hearsay. While the Government urges that the statement was admissible on several theories, e. g., verbal act; the statement of an agent (Willis) within the scope of his agency and made in the course of it, Fed.R.Evid. 801(d)(2)(D); or a statement made in furtherance of the conspiracy; it appears that the error, if any, was harmless. If Tompkins had been interrupted by an objection at the point when she testified that Willis was "out" (she was not), she could properly have testified that she asked Willis for drugs and that she received none. She then could have properly testified that she did receive them shortly after Willis had gone outside to meet Foster and Hightower. In either event, the inference was left to the jury that Foster and Hightower were the source of the heroin she eventually received.

We have reviewed carefully the remaining claims of error and find them to be without merit. The convictions are therefore affirmed.

See Appendix A on next page.

632

APPENDIX A*
SUPPLIERS

HEROIN

John Capra ("Johnny Hooks")
Leoluca Guarino
Steven Dellacava ("Beansie")

*Sebastian Intersimone
("Benny, 'Mr. B'")

COCAINE

*Juan Antonio Alvarez ("Tony")
*Angel Rodriguez ("Angelo")
Jose Luis Sureda ("Luis")
*Nelson Alvarez ("Tony's Brother")
Eduardo Yaujar ("Angelo's Uncle")
Lazaro Yaujar ("Angelo's Cousin")

MIDDLEMEN

*Frank Moten

John Brown

Michael Parker

DISTRIBUTORS

NEW YORK - NEW JERSEY

WASHINGTON, D.C.

*William Hightower
*Sidney Foster ("Chinch")
*Joseph Sampson ("Bootnose")
*Lois Sampson

*Bernard Brightman
Solon Glaze
*John Morris ("Papers")
*Lawrence Mitchell ("L.J.")
Willie Womack

*Don Wilson
*Albert Lee Jones ("Al from Norfolk")
*James Laws ("Tobe the Robe")
*Charles Cowpers ("Chi")
*Marion Dunmore

*Tommy Davis ("Bipty")
*John P. Morgan ("J.P.")
*Raphael Bonilla ("Spanish Michael")
"Little Michael")
Helen Kellem ("Pam")
Ann Reynolds (Lois' Sister)

CHICAGO, ILL.

*Yvonne Alvarez
Schennault
Al Williams ("Big Al from Chicago")
*Donald O'Dood

*Asterisks denote defendants on trial; defendants-appellants are denoted by underlining.